In the Matter of the Request for EXTRA-
DITION OF Peter Gabriel John
McMULLEN by the Government of the
United Kingdom of Great Britain and
Northern Ireland.

Peter G.J. McMULLEN, Petitioner–
Appellee–Cross–Appellant,

v.

UNITED STATES of America,
Respondent–Appellant–
Cross–Appellee.

Nos. 653, 654, Docket 91–2402, 91–2420.

United States Court of Appeals,
Second Circuit.

Argued Sept. 15, 1992.

Decided March 24, 1993.

Diogenes P. Kekatos, Asst. U.S. Atty.
for the S.D. of N.Y., New York City (Otto
G. Obermaier, U.S. Atty. for the S.D. of
N.Y., Marla Alhadeff and Richard W.
Mark, Asst. U.S. Attys. for the S.D. of
N.Y., of counsel), for respondent-appellant-
cross-appellee.

Ian Weinstein, Fordham University
School of Law, New York City (Henriette
D. Hoffman, The Legal Aid Society Federal
Defender Services, New York City, Michael
D. Schissel, Arnold & Porter, Washington,
DC, of counsel), for petitioner-appellee-
cross-appellant.

Before: MESKILL, Chief Judge,
TIMBERS, NEWMAN, KEARSE,
CARDAMONE, WINTER, PRATT,
MINER, ALTIMARI, MAHONEY,
WALKER and McLAUGHLIN, Circuit
Judges.

MINER, Circuit Judge, joined by
MESKILL, Chief Judge, and NEWMAN,
KEARSE, CARDAMONE, WINTER,
PRATT, MAHONEY, WALKER and
McLAUGHLIN, Circuit Judges:

## I.  INTRODUCTORY STATEMENT

Respondent - appellant - cross - appellee
United States of America appeals from a
judgment entered in the United States Dis-
trict Court for the Southern District of
New York (Ward, J.) granting the habeas
corpus petition of petitioner-appellee-cross-
appellant Peter G.J. McMullen.  The dis-

trict court granted the petition after finding that the Supplementary Extradition Treaty between the United States and the United Kingdom of Great Britain and Northern Ireland, under which McMullen was detained, violates the constitutional prohibition against bills of attainder as applied to McMullen and we affirmed. *See In re Extradition of McMullen*, 769 F.Supp. 1278 (S.D.N.Y.1991), *aff'd*, 953 F.2d 761 (2d Cir.1992). By order dated June 5, 1992, we directed a rehearing in banc of the appeal.

The district court rejected McMullen's contentions that the Supplementary Treaty as applied to him is a constitutionally forbidden *ex post facto* law; that the Treaty contravenes the doctrine of separation of powers by unlawfully encroaching upon the authority of the judicial branch; and that the government violated his due process rights by abusing its power in the course of the proceedings brought against him. The district court found it unnecessary, in light of its disposition of the case, to pass upon the due process violation claims: that the government intentionally delayed McMullen's departure and that it coerced incriminating statements from him. The district court held that these claims could not be decided without an evidentiary hearing in any event.

Of the issues resolved against him in the district court, McMullen presses on his cross appeal only his separation of powers contention. We reject that contention and therefore affirm as to the cross appeal. We think that the district court erred in classifying the Supplementary Treaty as a prohibited bill of attainder, however, and therefore reverse on the government's appeal. We remand the case to the district court for resolution of the due process issues that remain unresolved.

## II. THE BILL OF ATTAINDER CLAUSE IN HISTORICAL CONTEXT

"No bill of attainder ... shall be passed." U.S. Const. art. I, § 9, cl. 3.

An act of attainder may be defined to be an act of a legislative body deciding in a single case, upon mere arbitrary discretion, on the life and fortune of an individual—The very definition of the power shews of what an outrageous nature it is. No trial by jury, no certainty of defence, no security in innocence.... Justly has so despotic a power been rejected by our Constitution....

Justice James Iredell, "Charge to the Grand Jury of the Circuit Court for the District of New York," (Apr. 6, 1795), *reprinted in* 3 *The Documentary History of the Supreme Court of the United States, 1789–1800*, at 14, 15 (Maeva Marcus ed., 1990).[1]

Under the common law of England, attainder was the immediate consequence of a sentence of death. 4 William Blackstone, *Commentaries* *373. The judgment was said to fix a mark of infamy upon the person to be executed, who was "then called attaint, *attinctus* [or] stained." *Id.* The effect of common law attainder was two-fold: forfeiture to the crown of real and personal property, *id.* at *374, and "corruption of blood," which meant that the attainted person could neither inherit from his ancestors nor transmit his wealth or title to his heirs, *id.* at *381. The attainder that followed a sentence of death after trial is to be distinguished from the *bill* of

1. James Iredell was a delegate to the North Carolina ratification convention and served on the Supreme Court from his appointment in 1790 until his death in 1799. During the first decade of the Court's history, Iredell and the other Justices devoted most of their time to presiding over the nation's federal circuit courts, which were courts of original and appellate jurisdiction. At the opening of a circuit court, the Justices delivered a charge to the grand jury before it retired to decide whether it would return any indictments. The Justices often used this opportunity to explain and comment upon the significance of the nation's new Constitution. Thus, these charges are a rich source of information about the Justices' views on the constitutional issues of their time—issues that often did not come before the Supreme Court because of statutory limitations on its appellate jurisdiction. For a discussion of these charges and their historical significance, see David J. Katz, Note, *Grand Jury Charges Delivered by Supreme Court Justices Riding Circuit During the 1790s*, 14 Cardozo L.Rev. 1045 (1993).

attainder, a legislative enactment imposing punishment without trial.

The English Parliament first enacted bills of attainder around 1300. *See* Note, *Bills of Attainder and the Supreme Court in 1960*—Flemming v. Nestor, 1961 Wash.U.L.Q. 402, 403. The initial purpose of these bills was to ensure that the estates of dead traitors would escheat to the crown. *See* Michael P. Lehmann, *The Bill of Attainder Doctrine: A Survey of the Decisional Law*, 5 Hastings Const.L.Q. 767, 772 (1978). Later, bills of attainder were enacted to punish individuals for a variety of activities perceived to be contrary to the interests of the crown. *See* Comment, *The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause*, 72 Yale L.J. 330, 331 (1962). Parliament also enacted bills of pains and penalties, which were similar to bills of attainder but provided punishments other than death. *Id.*

The great Blackstone preferred to "speak not" of attainder, except as it existed in the common law:

> As for acts of parliament to attaint particular persons of treason or felony, or to inflict pains and penalties, beyond or contrary to the common law, to serve a special purpose, I speak not of them; being to all intents and purposes new laws, made *pro re nata*, and by no means an execution of such as are already in being.

4 Blackstone, *supra*, at *256.

Indeed, the acts of Parliament to which Blackstone referred are not a part of the proud heritage of English law. As Joseph Story observed:

> Bills of this sort have been most usually passed in England in times of rebellion, or of gross subserviency to the crown, or of violent political excitements; periods, in which all nations are most liable (as well the free, as the enslaved) to forget their duties, and to trample upon the rights and liberties of others.

Joseph Story, *Commentaries on the Constitution of the United States* § 678, at 485 (Carolina Academic Press photo. reprint 1987) (abr. ed. 1833).

Bills of attainder found their way to colonial America, *see* Alison Reppy, *The Spectre of Attainder in New York*, 23 St. John's L.Rev. 1, 3–4 (1948) and, during the period of the American Revolution, bills of attainder or bills of pains and penalties directed at British loyalists were enacted in each of the thirteen colonies, *see* Raoul Berger, *Bills of Attainder: A Study of Amendment by the Court*, 63 Cornell L.Rev. 355, 376–79 (1978). Bills of attainder were not unknown in the new states. The New York Constitution, adopted on April 20, 1777, was typical. Although it prohibited the state legislature from enacting bills of attainder, it included an exception "for crimes ... committed before the termination of the present war," *see* Reppy, *supra*, at 19. Complete corruption of blood was prohibited, however, even in the excepted cases. *Id.* Between the Declaration of Independence and the 1783 Treaty of Peace, approximately sixty pieces of attainder legislation were enacted in New York, including the Attainder Act of October 22, 1779, under which fifty-nine citizens were attainted, with consequent forfeiture of property. *See id.* at 17–35.

As a member of the Virginia legislature, Thomas Jefferson was involved in the adoption of legislation in 1778 to attaint one Josiah Phillips for "hav[ing] levied war against this Commonwealth." Thomas Jefferson, "Bill to Attaint Josiah Phillips," (May 28, 1778), *reprinted in* 3 *The Founders' Constitution* 345, 345 (Philip B. Kurland & Ralph Lerner eds., 1987). The enactment was unusual in that it required Phillips and his associates to present themselves for trial or else stand convicted of high treason and suffer the death penalty as well as forfeiture. *Id.* Jefferson replied somewhat testily to criticism of his role in the Phillips attainder, charging his critic with a "diatribe" against the abuse of bills of attainder and giving his own views as follows:

> The occasion and proper office of a bill of attainder is this: When a person charged with a crime withdraws from justice, or resists it by force, ... no other means of bringing him to trial or punishment being

practicable, a special act is passed by the legislature adapted to the particular case. This prescribes to him a sufficient time to appear and submit to a trial by his peers, declares that his refusal to appear shall be taken as a confession of guilt, as in the ordinary case of an offender at the bar refusing to plead, and pronounces the sentence which would have been rendered on his confession or conviction in a court of law. No doubt that these acts of attainder have been abused in England as instruments of vengeance by a successful over a defeated party. But what institution is insusceptible of abuse in wicked hands?

*See* Letter from Thomas Jefferson to L.H. Girardin (Mar. 12, 1815), *in id.* at 349, 349. Jefferson noted that Phillips ultimately was captured, indicted, tried by jury "in the ordinary way," convicted and "sentenced and executed under the common law; a course which every one approves, because the first object of the act of attainder was to bring him to fair trial." *Id.* Jefferson's definition of a bill of attainder was not, of course, the generally accepted one.

It seems obvious that the Framers were very much aware of English practices as well as the practices in the colonies and the states when they considered the matter of bills of attainder at the Constitutional Convention in Philadelphia. The matter was brought forward in a single proposal for a constitutional provision prohibiting both bills of attainder and *ex post facto* laws. After the necessity for a provision proscribing *ex post facto* laws was challenged, according to records of the convention,

> [t]he question [was] divided, [and] [t]he first part of the motion relating to bills of attainder was agreed to *nem. contradicente.*

Records of the Federal Convention, *reprinted in id.* at 347. The Constitution, as finally adopted, prohibited *both* the states and the federal government from passing bills of attainder. U.S. Const., art. I, §§ 9 & 10.

In the public relations campaign to secure ratification of the Constitution, James Madison wrote that "[b]ills of Attainder

... are contrary to the first principles of the social compact and to every principle of sound legislation." *The Federalist No. 44,* at 282 (Clinton Rossiter ed., 1961). Madison quoted Montesquieu on the evils of imparting judicial powers to the legislative branch: "Again: 'Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator.*'" *The Federalist No. 47,* at 303.

The Supreme Court was confronted with a bill of attainder issue early on. In *Cooper v. Telfair,* 4 U.S. (4 Dall.) 14, 1 L.Ed. 721 (1800), the Court declined to declare void a 1782 Act of the Georgia legislature attainting British loyalists and confiscating their property. The Act was raised as a defense in an action to recover on a debt. Each participating Justice wrote a separate opinion, but Justice Samuel Chase conveyed the general tenor of the various opinions when he wrote that "[t]here is ... a material difference between laws passed by the individual states, during the revolution, and laws passed subsequently to the organization of the federal constitution. Few of the revolutionary acts would stand the rigorous tests now applied...." *Id.* at 19. Although it was not necessary to the disposition of the case, which turned on the interpretation of the Contracts Clause, Chief Justice Marshall turned his attention to the office of a bill of attainder in *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 138, 3 L.Ed. 162 (1810): "A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both."

The first significant Supreme Court decisions dealing with bills of attainder came in the wake of the Civil War and involved the so-called "test oath" statutes. The statute examined in *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867), made it a criminal offense for a Catholic priest to practice his vocation without having sworn that he had not supported the Confederacy. In striking down the statute, the Court noted that a bill of attainder "is a legislative act which inflicts punishment without a judicial trial." *Id.* at 323. The Court read the Bill of Attainder Clause

broadly to prohibit bills of pains and penalties as well as bills of attainder, holding that the "inhibition [of the Bill of Attainder Clause] was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised." *Id.* at 325. *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 374–81, 18 L.Ed. 366 (1867), decided on the same day as *Cummings*, struck down an Act of Congress that prohibited any person from holding office or practicing law who would not swear that he had not supported the Confederacy. The dissent, applying to both *Cummings* and *Garland*, pointedly noted what the Court had done in these two oath cases—extended the protection of the Bill of Attainder Clause to members of a class who were not the subject of criminal punishment: "[a] statute ... which designates no criminal, either by name or description—which declares no guilt, pronounces no sentence, and inflicts no punishment—can in no sense be called a bill of attainder." *Id.* at 390 (Miller, J., dissenting).

Legislation influenced by the "Cold War" gave rise to more bill of attainder jurisprudence. In *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), the Supreme Court invalidated a statute preventing the payment of salaries to three federal employees believed to be subversive. The Court observed that the bill of attainder provisions of the Constitution proscribe any legislative act "no matter what [its] form, that appl[ies] either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *Id.* at 315, 66 S.Ct. at 1078. Noncriminal punishment is included. In *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), the Court invalidated a statute denying labor union employment to most members of the Communist Party. With regard to the "punishment" element, the Court noted that it had "emphatically rejected the argument that the constitutional prohibition outlawed only a certain class of legislatively imposed penalties." *Id.* at 447–48, 85 S.Ct. at 1714.

Also noted was the fact that the Bill of Attainder Clauses

> reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.

*Id.* at 445, 85 S.Ct. at 1713.

The modern definition of "punishment" for bill of attainder purposes was established by the Supreme Court in connection with former President Richard Nixon's challenge to the Presidential Recordings and Materials Preservation Act, Pub.L. No. 93–526, §§ 101–106, 88 Stat. 1695, 1695–98 (1974). The Act provided that the Administrator of General Services take custody of Nixon's papers and tape recordings and promulgate regulations for access to the materials. Certain private papers of the former President were to be returned to him after screening by government archivists. *See Nixon v. United States*, 978 F.2d 1269, 1271–72 (D.C.Cir.1992) (describing in detail the legislative and regulatory scheme of the Act). In holding that the Act was not a bill of attainder, the Court applied three tests to determine whether legislative punishment of the type contemplated by the Bill of Attainder Clauses was imposed: the "historical" test, involving "punishment traditionally judged to be prohibited by the Bill of Attainder Clause," *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 475, 97 S.Ct. 2777, 2806, 53 L.Ed.2d 867 (1977), including death, imprisonment, banishment, punitive confiscation of property by the sovereign and, in more recent times, laws "barring designated individuals or groups from participation in specified employments or vocations," *id.* at 474, 97 S.Ct. at 2806; the "functional" test, which "analyz[es] whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes," *id.* at 475–76, 97 S.Ct. at 2806–07; and the "motivational" test, which "inquire[s] whether the legislative record evinces a congressional intent to punish," *id.* at 478, 97 S.Ct. at 2808.

Measured by the tests established, the *Nixon* Court found that the Act under scrutiny: did not fall within the historical definitions of punishment, including forfeiture, since there was a provision for an award of just compensation for any loss sustained, *id.* at 475, 97 S.Ct. at 2806; functioned to further nonpunitive legislative purposes, including the preservation of materials to complete prosecutions and the safeguarding of the public interest in access to materials of public importance, *id.* at 476–77, 97 S.Ct. at 2807; and demonstrated a motive to undo a certain agreement, "the terms of which departed from the practice of former Presidents in that they expressly contemplated the destruction of certain Presidential materials," *id.* at 479, 97 S.Ct. at 2808, rather than a motive to punish. It is the tests established in *Nixon* that ultimately must be applied in the case at bar. *See also Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 852, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984).

### III. THE SUPPLEMENTARY EXTRADITION TREATY BETWEEN THE UNITED STATES AND GREAT BRITAIN

The Supplementary Extradition Treaty amended and supplemented the Extradition Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland, June 8, 1972, U.S.—Gr.Br., 28 U.S.T. 227 (entered into force Jan. 21, 1977) ("1977 Treaty"). It includes a retroactive provision as follows:

This Supplementary Treaty shall apply to any offense committed before or after this Supplementary Treaty enters into force, provided that this Supplementary Treaty shall not apply to an offense committed before the Supplementary Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.

Supplementary Extradition Treaty, art. 5, June 25, 1985, U.S.—Gr.Br., *reprinted in* S.Exec.Rep. No. 17, at 2, 99th Cong.2d Sess. 17 (1986) (entered into force Dec. 23, 1986) ("Supplementary Treaty").

The principal substantive changes effected by the Supplementary Treaty relate to the political offense exception to extradition under the 1977 Treaty. The provisions relating to this exception in the 1977 Treaty state that a person will not be extradited if:

(i) the offense for which extradition is requested is regarded by the requested Party as one of a political character; or
(ii) the person sought proves that the request for his extradition has in fact been made with a view to punish him for an offense of a political character.

1977 Treaty, art. V(1)(c), 28 U.S.T. at 230.

Article 1 of the Supplementary Treaty narrows the scope of the "offense of a political character" exception referred to above by excluding from its purview:

(a) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit his case to their competent authorities for decision as to prosecution;
(b) murder, voluntary manslaughter, and assault causing grievous bodily harm;
(c) kidnapping, abduction, or serious unlawful detention, including taking a hostage;
(d) an offense involving the use of a bomb, grenade, rocket, firearm, letter or parcel bomb, or any incendiary device if this use endangers any person; [or]
(e) an attempt to commit any of the foregoing offenses or participation as an accomplice of a person who commits or attempts to commit such an offense.

Supplementary Treaty, art. 1, *reprinted in* S.Exec.Rep. No. 17, at 15.

Although a person accused of any one of these crimes may no longer use the political offense exception of the 1977 Treaty, Article 3 of the Supplementary Treaty provides additional safeguards against political prosecution. The Article reads in pertinent part:

[E]xtradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the re-

quest for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his trail [sic] or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality, or political opinions.

*Id.*, art. 3(a), *reprinted in* S.Exec.Rep. No. 17, at 16. Article 3 also provides for an appeal by either party of an extradition determination and for "expedited consideration at every stage." *Id.*, art. 3(b), *reprinted in* S.Exec.Rep. No. 17, at 16.

The policy considerations underlying the President's decision to conclude the Supplementary Treaty in the exercise of his constitutional treaty making powers, U.S. Const. art. II, § 2, were articulated by the State Department's Legal Adviser in a prepared statement presented to the Senate Foreign Relations Committee:

It is a shocking and disgraceful fact that criminals who commit [terrorist acts] against the citizens of other nations, and manage therefore [sic] to get to the U.S., are often able under current U.S. law, successfully to invoke the political offense .exception and thereby escape extradition. Worst of all, in many cases in which the exception can be successfully invoked under present law, the United States is unable to prosecute the terrorists involved, because we lack jurisdiction for most offenses committed abroad. . . . The treaty amendment . . . would prevent such travesties of justice with respect to extradition requests between the United States and the United Kingdom.

*The United States and United Kingdom Supplementary Extradition Treaty: Hearings on Treaty Doc. No. 8 Before the Committee on Foreign Relations*, 99th Cong., 1st Sess., 248–49 (1985) (prepared statement of Abraham D. Sofaer).

During the debate over the ratification of the Supplementary Treaty, Senator Richard Lugar, the Chairman of the Foreign Relations Committee, made it clear that the treaty would reverse three cases where extradition previously had been denied on

the basis of the political offense exception of the 1977 Treaty. The case of Peter G.J. McMullen was one of the three:

In three cases where [the political offense exception under the 1977 Treaty] has been [invoked], the Federal courts have denied requests by the United Kingdom for the extradition of members of the Provisional Irish Republican Army accused of committing acts of violence. . . . [I]t was because of these cases that on June 25, 1985, the United States and the United Kingdom signed the Supplementary Extradition [Treaty]. Its purpose is to reverse the three cases where extradition was denied and put an end to this development in the law.

132 Cong.Rec. 16,558, 16,586 (1986).

Senator Alphonse D'Amato expressed his concern about applying the Supplementary Treaty to those who successfully had invoked the political offense exception:

Approving this treaty in its present form may well result in the extradition of certain individuals who American courts have refused to extradite after the most careful consideration.

Such a result would be similar to the enactment of a bill of attainder or an ex post facto law in violation of the principle contained in article I, section 9, clause 3, of our Constitution. . . .

*Id.* at 16,592. Senator D'Amato therefore proposed an amendment that would have exempted from extradition those individuals who already had been successful in claiming the political offense exception. The amendment failed, and the Extradition Treaty was ratified as presented to the Senate. *See id.* at 16,600.

## IV. PROCEEDINGS RELATIVE TO THE EXTRADITION OF PETER G.J. McMULLEN

McMullen used a false Republic of Ireland passport to enter the United States in early 1978. He was arrested by the Immigration and Naturalization Service ("INS") on May 19, 1978 on the basis of his unlawful entry. While in the custody of the INS, McMullen made certain statements ·to INS investigators regarding his entry into this

country, his membership in the Provisional Irish Republican Army ("PIRA"), and his participation in a bombing attack at a British Army barracks in Belfast, Northern Ireland. McMullen also provided information to the authorities when he was interviewed by agents of the Federal Bureau of Investigation and officials of the British police agency, New Scotland Yard. During that interview, he again admitted to his participation in the bombing attack at Belfast and also admitted planning and participating in a PIRA sponsored bombing attack at Claro Army Barracks at Ripon, England in 1974.

On June 20, 1978, a Justice of the Peace in Ripon, County of North Yorkshire, England, issued a warrant for McMullen's arrest on two counts of attempted murder and other crimes arising out of the bombing of the Claro Barracks. The United Kingdom thereafter filed a request for the extradition of McMullen to stand trial on the charges subject of the Ripon warrant. In July of 1978 the United States, on behalf of the United Kingdom, filed a formal request for McMullen's extradition. Deportation proceedings, previously commenced by the INS to deport McMullen for illegal entry into the United States, were held in abeyance pending the extradition proceeding.

Magistrate Judge Frederick J. Woelflen of the United States District Court for the Northern District of California held a hearing on the extradition request. He found that McMullen was a member of the PIRA at the time of the Ripon bombing and that the PIRA was then engaged in a political uprising against the British. Because McMullen's crimes were committed at the behest of the PIRA and in furtherance of its political objectives, the Magistrate Judge concluded that the crimes in question were encompassed by the political offense exception of the 1977 Treaty. The Magistrate Judge therefore denied the extradition request. See 18 U.S.C. § 3185 (1988).

When the deportation hearings resumed, McMullen conceded that he was deportable on the ground of illegal entry but request-

ed asylum in the United States or withholding of deportation to the Republic of Ireland, in accordance with the provisions of 8 U.S.C. §§ 1158(a) and 1253(h). Both forms of relief were granted by an immigration judge, whose decision later was reversed by the Board of Immigration Appeals. The Ninth Circuit held that the Board's decision was not supported by substantial evidence. See McMullen v. INS, 658 F.2d 1312 (9th Cir.1981). On remand, the Board again denied the application for asylum and withholding of deportation. On McMullen's second petition to the Ninth Circuit for review, the court agreed with the Board that McMullen was statutorily ineligible for withholding of deportation because there was substantial reason to believe that he had committed serious nonpolitical offenses. See McMullen v. INS, 788 F.2d 591, 598 (9th Cir.1986). The court further held that the Board properly had denied McMullen's application for asylum. See id. at 599–600.

On December 24, 1986, while McMullen was in New York en route to the Republic of Ireland pursuant to the order for his deportation, the United Kingdom requested that McMullen be extradited on the basis of the same 1978 warrant that had formed the basis for the earlier extradition request. A provisional arrest warrant was issued immediately, and the deportation was cancelled. On February 11, 1987, the United Kingdom filed a formal request for McMullen's extradition under the 1977 and Supplementary Extradition Treaties.

McMullen first moved to dismiss the second extradition warrant in August of 1987, contending that the statute of limitations barred his extradition for crimes committed in 1974. That motion was denied in June of 1988, when Magistrate Judge Kathleen Roberts held that McMullen's flight from the United States and his continued resistance to efforts to effect his return had tolled the statute. His second motion to dismiss the new extradition warrant was bottomed on constitutional claims: that the Supplementary Treaty as applied to him was a bill of attainder, an ex post facto law and a violation of the doctrine of separation of powers. McMullen also contended that

his constitutional rights to due process were violated in the manner in which the government had proceeded against him.

In July of 1989, Magistrate Judge Roberts noted that she lacked jurisdiction to consider the constitutional issues raised by McMullen because she was sitting as an extradition magistrate under the authorization of 18 U.S.C. § 3184 rather than as a judicial officer within an Article III court. The parties agreed, whereupon McMullen filed the habeas corpus petition giving rise to these appeals, putting forth the same arguments presented on his second motion to Magistrate Judge Roberts for the dismissal of the extradition warrant. Although a petition for a writ of habeas corpus generally is not filed until extradition hearings are completed, *see, e.g., Spatola v. United States*, 925 F.2d 615 (2d Cir.1991); *United States ex rel. Rauch v. Stockinger*, 269 F.2d 681 (2d Cir.), *cert. denied*, 361 U.S. 913, 80 S.Ct. 257, 4 L.Ed.2d 183 (1959), the parties stipulated that the issues raised in this habeas petition should be resolved at an earlier stage on account of the need to determine whether the 1977 Treaty or the Supplementary Treaty would govern the McMullen extradition proceedings.

In concluding that the Supplementary Extradition Treaty was a bill of attainder as applied to McMullen, the district court found that McMullen was a "target of the Supplementary Treaty," *In re Extradition of McMullen*, 769 F.Supp. at 1287, along with the two other PIRA members referred to in the Senate ratification debate, noting that "the Senate's agenda was primarily the extradition of three individuals." *Id.* at 1287 n. 10. The district court accordingly found that the Supplementary Treaty imposed punishment upon McMullen under the functional and motivational tests discussed in *Nixon v. Administrator of General Services, supra. See id.* at 1288–89. Finally, the district court determined that the punishment imposed upon McMullen was inflicted without the benefit of meaningful judicial processes in that the ratification of the Supplementary Treaty accomplished the punishment of McMullen without the benefit of a judicial trial. *See id.* at 1290.

The parties have stipulated to a stay of the writ pending appeal. The decision of the district court was affirmed by a divided panel of this Court on January 7, 1992. *See McMullen v. United States*, 953 F.2d 761 (2d Cir.1992). We ordered rehearing in banc by order dated June 5, 1992 and the rehearing was held on September 15, 1992. McMullen has remained in the custody of the United States Marshals Service since December 24, 1986.

## V. IS THE SUPPLEMENTARY TREATY A BILL OF ATTAINDER AS APPLIED TO PETER G.J. McMULLEN?

■ In order to determine whether a congressional enactment is a bill of attainder, the Supreme Court has adopted a three-pronged conjunctive test that considers whether the act: (1) imposed punishment, (2) specified the affected persons, and (3) lacked the protection of judicial process. *See Selective Serv. Sys.*, 468 U.S. at 847, 104 S.Ct. at 3352. Because the Supplementary Treaty does not in any sense " 'inflict[ ] punishment without a judicial trial,' " *Lovett*, 328 U.S. at 315, 66 S.Ct. at 1078 (quoting *Cummings*, 71 U.S. (4 Wall.) at 323), it cannot be classified as a bill of attainder as applied to McMullen. Although punishment may follow extradition, extradition itself never has been considered punishment. *United States ex rel. Oppenheim v. Hecht*, 16 F.2d 955, 956 (2d Cir.), *cert. denied*, 273 U.S. 769, 47 S.Ct. 572, 71 L.Ed. 883 (1927). In an extradition proceeding, the role of the judge is "to determine whether there is competent evidence to justify holding the accused to await trial." *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922). What is at issue in the proceeding, therefore, "is not punishability but prosecutability." M. Cherif Bassiouni, *International Extradition and World Public Order* 524 (1974).

The statute entitled: "Fugitives from foreign country to United States" provides:

> If, on [an extradition] hearing, [the judge] deems the evidence sufficient to

sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention. . . .

18 U.S.C. § 3184. According to the statute, the extradition proceeding culminates in a "surrender" to the foreign government rather than in punishment of any sort.

McMullen has not yet had a hearing to determine whether "surrender" would be proper. Before that determination is made, he is entitled to the due process protections of an extradition proceeding, including notice in the form of a "complaint made under oath, charging [him] . . . with having committed within the jurisdiction of [the] foreign government any of the crimes provided for by such treaty," as well as a hearing at which "evidence of criminality may be heard and considered." *Id.* The consequence of McMullen's "surrender" may be punishment in Great Britain, but that will follow a trial in the common law tradition from which our own criminal justice system is derived. Trial in Great Britain itself is by no means certain, because the government first must prevail at the extradition hearing.

There are a number of issues that McMullen is entitled to raise at an extradition hearing. One of these is provided by an important modification to the 1977 Treaty made by the Supplementary Treaty: the right to establish that the request for extradition was made with the view to punish on account of "race, religion, nationality, or *political opinions*" or that, in the case of a surrender, there would be prejudice at trial for the same reasons. Supplementary Treaty, art. 3(a), *reprinted in* S.Exec.Rep. No. 17, at 16 (emphasis added). It is noteworthy that there is a right to an immediate appeal of a determination of an issue raised under Article 3(a), with "expedited consideration at every stage." *Id.*, art. 3(b), *reprinted in* S.Exec.Rep. No. 17, at 16. Ordinarily, extradition proceedings

that result in issuance of a certificate may be "reviewed" at the instance of the person extradited only collaterally by a writ of habeas corpus. *See United States v. Doherty*, 786 F.2d 491, 501 (2d Cir.1986).

As noted earlier, courts have developed a series of tests to ascertain whether the enactment in question inflicts forbidden punishment for purposes of a bill of attainder. The inquiry is fact specific, and a court must consider "(1) whether the challenged [act] falls within the historical meaning of legislative punishment; (2) whether the [act] 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Sys.*, 468 U.S. at 852, 104 S.Ct. at 3355 (quoting *Nixon*, 433 U.S. at 473, 475–76, 478, 97 S.Ct. at 2805, 2806–07, 2808). It is certain that the Supplementary Treaty as applied to McMullen does not meet the "historical" test for bill of attainder punishment contemplated by *Nixon*. In disagreement with the district court, we do not think that it meets the "functional" or "motivational" tests either. It cannot be gainsaid that the Supplementary Treaty functioned to further nonpunitive legislative purposes. Those purposes included furtherance of the United States policy of combatting international terrorism and strengthening relations with an important and traditional ally. The district court recognized these legitimate goals of the Supplementary Treaty but decided that the burdens imposed upon McMullen outweighed those goals.

We do not think that the burdens imposed upon McMullen are so severe that they eclipse the legitimate purposes of the Supplementary Treaty. McMullen would be subject to future extradition proceedings, despite the retroactive effect of the provision eliminating the political offense exception for the crimes of which McMullen is accused. Since an extradition hearing merely leads to a preliminary determination of probable cause, neither the doctrine of res judicata nor the Fifth Amendment protection against double jeopardy

would apply. *See Collins v. Loisel,* 262 U.S. 426, 430, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923). The government would be free to institute a further extradition request. Therefore, even without the retroactive provision, if the United Kingdom were again to request McMullen's extradition, his case would be reevaluated under the Supplementary Treaty. Surely, then, another extradition hearing does not constitute an unconstitutional burden. Moreover, the Supreme Court has indicated that only when a legitimate purpose is not apparent will the Court deem the purpose of the decisionmaker to be the punishment of the individual. *See Nixon,* 433 U.S. at 475–76, 97 S.Ct. at 2806–07. A clearly nonpunitive purpose has been identified here, the district court's finding of "ulterior motive" notwithstanding.

As to the Senate's motivation, even if it were assumed that Senator Lugar spoke for the entire Senate when he said of the Supplementary Treaty that "[i]ts purpose is to reverse the three cases where extradition was denied," the ratification of the Treaty did not express a motive to punish but rather a motive to extradite the three individuals for trial and *possible* punishment. It simply cannot be said that "the legislative record evinces a congressional intent to punish." *Id.* at 478, 97 S.Ct. at 2808.

There is no basis for the contention that the Senate intended to "target" McMullen. It did not extend the Supplementary Treaty to bring McMullen within its coverage; it only declined to adopt the D'Amato amendment to exempt him. Had the Senate consented to the Supplementary Treaty with a reservation that imposed a new burden upon McMullen (or those previously determined to be exempt from extradition by the former political offense exception), a bill of attainder issue might well arise. No burden was added to the Treaty in this case. It actually was modified in a way that benefits McMullen in that it added considerable due process protections. The fact that the Senate rejected the D'Amato amendment and declined to make the Treaty *better* for McMullen than the terms of the Treaty as negotiated by the Executive

Branch does not demonstrate the motive to punish that calls forth bill of attainder protection. Nor does "targeting" occur because some (perhaps most) senators had the facts of three cases, including McMullen's, in mind in deciding to agree with the President that the political offense exception should be narrowed for all persons.

## VI. DOES THE SUPPLEMENTARY TREATY CONTRAVENE THE DOCTRINE OF SEPARATION OF POWERS?

■ We reject McMullen's claim that the Supplementary Treaty impermissibly invades the province of the judiciary by altering the jurisdiction of the courts. Congress has conferred jurisdiction upon the federal courts to conduct extradition proceedings. *See* 18 U.S.C. § 3184. Section 3184 expressly provides, however, that an extradition court must be governed by the provisions of the pertinent treaty. The evidence at an extradition hearing cannot suffice unless the court determines that it is "sufficient to sustain the charge under the provisions of the proper treaty." *Id.* Accordingly, the extradition court has the authority to interpret and apply the terms of the governing treaty. *See Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960). Whether the political offense exception applies is a matter for the courts, of course. Whether there *should be* a political offense exception is a matter to be determined by the Legislative and Executive Branches in the exercise of their extradition treaty-making and extradition treaty-ratifying powers. *Wilson v. Girard,* 354 U.S. 524, 530, 77 S.Ct. 1409, 1412, 1 L.Ed. 1544 (1957) (per curiam). Courts do not have the authority to engraft substantive provisions upon treaties of any sort. The district court properly held:

> Whether or not to include a "political offense" exception in an extradition treaty is a policy judgment, which rests exclusively in the discretion of the Executive Branch and the Senate.

*In re Extradition of McMullen,* 769 F.Supp. at 1294. Moreover, the Supple-

mentary Treaty preserves the proper function of the judiciary—to determine that there is probable cause to believe that the accused has committed the offense and that no defense to extradition applies under the terms of the Treaty. *See In re United States,* 713 F.2d 105, 108 (5th Cir.1983).

Also properly rejected by the district court was the contention that the President and the Senate avoided the bicameral process by eliminating the political offense exception in the Supplementary Treaty. While it is true that Congress considered but failed to enact new legislation that would have narrowed the political offense exception or stripped courts of the jurisdiction to consider the exception in all extradition cases, the President and Senate remain vested with the authority to eliminate the political offense exception on a treaty-by-treaty basis. In this regard, it is important to note that the Senate, in ratifying the Supplementary Treaty, emphasized that it would not similarly approve any treaty that narrows the political offense exception in regard to any nondemocratic or totalitarian government and that the Supplementary Treaty would not necessarily be a precedent for other extradition treaties. Indeed, Senator Lugar promised to conduct a "searching review" of any new treaties and to consider each "on its own merits." 132 Cong.Rec. 16,588 (1986).

The Supplementary Treaty properly was concluded by the President and ratified by the Senate. The role of the judiciary with regard to extradition treaties remains unchanged, governed as it is by the relevant statute, 18 U.S.C. § 3184, and the terms of the Treaty.

## VII.  CONCLUSION

We affirm the judgment of the district court to the extent of its determination that the Supplementary Treaty does not contravene the doctrine of separation of powers. We reverse the judgment of the district court to the extent that it grants the habe-

as corpus petition on the ground that the Supplementary Treaty is a bill of attainder as applied to Peter G.J. McMullen. We remand to the district court to allow it to pass upon the due process violation claims and for further proceedings consistent with the foregoing.

ALTIMARI, Circuit Judge (joined by WILLIAM H. TIMBERS, Circuit Judge), concurring in part and dissenting in part:

Since we have for too long defined the term "punishment" in an esoteric and metaphysical context applying epistemological distinctions, and because in the real world punishment is easily understood, and for the reason that the majority displays a disregard for the real meaning of punishment and slavishly follows jurisprudential dogma, I most respectfully dissent from that portion of the majority opinion which holds that the Supplementary Treaty does not constitute a Bill of Attainder.

The fate of McMullen is all but certain. He has two chances of avoiding extradition—slim and none.

The majority opinion cites to cases that preordain this matter. In all candor, they appear to be following the law as it might be reasonably interpreted today. In my judgment the time has come to expand the legal definition of punishment in order to bring it within the real meaning and common understanding shared by an enlightened late twentieth century society. I will attempt in this dissent to do so.[1]

I.  *The Bill of Attainder Provision Applies To Treaties.*

As an initial matter I note that the Bill of Attainder provision is a limit on the Congress in Article I, not on the President in whom the treaty-making power is vested in Article II. Article II, Section 2, as it relates to the President's power to make treaties, is, however, a power conditioned upon the consent of the Senate. The Senate needless to say is a house of Congress. As

---

**1.** A complete statement of the relevant facts and claims of the parties is set forth in the opinion of the three-judge panel that initially heard this appeal more than 15 months ago—on December

3, 1991. *McMullen v. United States,* 953 F.2d 761 (2d Cir.1992). McMullen has been held without bail for more than 6 years—since December 24, 1986. *See Id.* at 763.

part of Congress, the Senate is vested with certain authority and at the same time prohibited from the exercise of other powers. Among the limits on Congress, and hence the Senate, is the mandate of Article I, section 9, that "[n]o Bill of Attainder or ex post facto law shall be passed." It therefore follows that enactments of the Senate in whatever form are subject to the judicial scrutiny for compatibility under the Bill of Attainder Clause. Any other interpretation would require a holding that treaties are not fully amenable to review under Article III, section 2. *See Marbury v. Madison,* 5 U.S. 137, 177–78, 1 Cranch 87, 111, 2 L.Ed. 60 (1803) ("It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or that the legislature may alter the constitution by an ordinary act.").

The Supreme Court has often noted that "[l]egislative acts, *no matter what their form,* that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States v. Brown,* 381 U.S. 437, 448–49, 85 S.Ct. 1707, 1715, 14 L.Ed.2d 484 (1964) (emphasis added) (quoting *United States v. Lovett,* 328 U.S. 303, 315, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946)). A treaty is submitted for Senate approval, and the process of Senate approval imbues this instrument with all the attributes of a legislative act under the broad definition enunciated in *Brown* and *Lovett.* Indeed, the Senate has the last word in the treaty making process. Amendments to a treaty can, and in this case were, proposed and voted on. The Senate's rejection of Senator D'Amato's proposed amendment, discussed in the majority opinion, whereby the Supplementary Treaty would apply retroactively except in those cases where extradition had already been sought and denied under the 1977 Treaty, is but one example of how the Senate placed its legislative stamp upon the treaty at issue here.

As Judge Timbers noted in the panel opinion, the Bill of Attainder clause in the Constitution was designed as one of the bulwarks maintaining the separation of powers inherent in our constitutional form of government. 953 F.2d at 765. This clause prevents the legislative exercise of judicial power by inflicting punishment without a judicial trial. *United States v. Lovett,* 328 U.S. at 315, 66 S.Ct. at 1079. Therefore, allowing one house of Congress to circumvent the Bill of Attainder provision through the treaty-making process would create a significant exception to this prohibition. As Justice Black noted, "[t]he prohibitions of the Constitution were designed to apply to all branches of the National Government." *Reid v. Covert,* 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957).

I must conclude, therefore, that the Supplementary Treaty with Great Britain is a "legislative act" subject to the full judicial power of the United States. This is also the conclusion of Louis Henkin, the preeminent constitutional scholar in the area. According to Henkin, "[t]he prohibitions set forth in Article 1, section 9, ... though contained in the article devoted principally to Congress and following immediately upon the catalogue of its powers, [must] doubtless be held to apply to treaties as well." Louis Henkin, *Foreign Affairs And The Constitution* 140 (1972). As Henkin notes, a contrary holding would allow treaties to circumvent all the limitations contained in Article I, section 9. Thus, a treaty could grant a title of nobility, or lay a duty on articles exported from any State, or give preference to ports of one State over those of another. *Id.* In fact, the First Amendment on its face only places limits on Congress. Consequently, if we held that the limitations contained in Article I, section 9 do not place limits on treaties, because they are addressed only to Congress, then by analogy this reasoning would seemingly allow a treaty to violate the First Amendment.

Therefore, I concur with the majority's implicit assumption that a treaty can constitute a Bill of Attainder.

## II. *The Supplementary Treaty Is a Bill of Attainder.*

A Bill of Attainder is defined as "a law that legislatively determines guilt and in-

flicts punishment upon an identifiable individual without the protections of a judicial trial." *Selective Service Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 847, 104 S.Ct. 3348, 3352, 82 L.Ed.2d 632 (1984) (citation omitted). Thus, to operate as a Bill of Attainder, a legislative act must satisfy three requirements: "specification of the affected persons, punishment, and lack of a judicial trial." *Id.* at 841, 104 S.Ct. at 3349. In conducting this test, the Supreme Court has cautioned courts to pay close attention to the facts of each case. *See Selective Service Sys.*, 468 U.S. at 852, 104 S.Ct. at 3355 ("each [Bill of Attainder] case has turned on its own highly particularized context") (quoting *Flemming v. Nestor*, 363 U.S. 603, 616, 80 S.Ct. 1367, 1375, 4 L.Ed.2d 1435 (1960)). Judge Timbers' fine opinion did just that, and I believe it should have been adhered to.

### A. Specification.

It cannot be seriously contested that the Supplementary Treaty specified McMullen for punishment. Indeed, the majority opinion appears to concede this point. A legislative act may meet the specification requirement either by naming the individual or by focusing on easily identifiable members of a class. *See Id.* 468 U.S. at 841, 104 S.Ct. at 3349; *Nixon v. Administrator of Gen. Services*, 433 U.S. 425, 469, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977). As the panel observed, a review of the relevant legislative history clearly indicates that the legislation, particularly the changes to the "political offense exception," was directed at a small group of former PIRA terrorists of which McMullen was a member.

The sponsor of the Supplementary Treaty, and Chairman of the Senate Foreign Relations Committee, Senator Lugar, noted during the congressional debate on the Treaty that in three recent cases, including McMullen's, the federal courts have denied extradition of ex-PIRA members because their crimes fell within the 1977 Treaty's "political offense exception." *See* 953 F.2d at 765. The opinions in these cases were then placed in the Congressional Record. Thereafter, Senator Lugar explained that "it was because of these cases" that the Supplementary Treaty was signed. *See* 132 Cong.Rec. 16,586 (1986). According to Senator Lugar, the purpose of the Treaty was "to reverse the three cases where extradition was denied and put an end to this development in the law." *Id.*

As the panel noted, additional evidence that the Treaty was intended to target specific individuals is found in the debate concerning Senator D'Amato's proposed amendment regarding the retroactive application of the Treaty to the three named individuals. *See* 953 F.2d at 765. This proposed amendment sought to except from the retroactive application of the treaty those cases where extradition had already been sought and denied under the 1977 Treaty. *See* 132 Cong.Rec. at 16,594. This amendment would have exempted only three individuals from the purview of the Supplementary Treaty. In resisting this proposed amendment, Senator Lugar observed that "[t]he effect of this amendment would be to protect two individuals, who are admitted terrorists and who are not in the United States...." *Id.* at 16,595. Lugar then commented that it was "important to consider the specific individuals we are talking about...." *Id.* Consequently, the panel correctly concluded that McMullen is clearly within the group of people affected by the D'Amato amendment and targeted by Lugar's comments. 953 F.2d at 765–66.

The Senate ultimately rejected the amendment. As the opinions of the district court and the panel observed, in so doing, the Senate endorsed Senator Lugar's stated purpose for the Treaty, namely, to reverse the three cases where extradition was denied. As the panel concluded, despite the Treaty's general applicability, and despite the fact that it could lawfully operate retroactively, the stated purpose of the Treaty, as well as the rejection of the D'Amato amendment, together exhibit an intent to target a small group of individuals with this Treaty.

### B. Punishment.

The second requirement of a Bill of Attainder is that it inflict punishment on a

specific individual or group. *Selective Service*, 468 U.S. at 847, 104 S.Ct. at 3352. This is admittedly a much tougher issue.

For Bill of Attainder purposes, the severity of the sanction imposed by legislation is not determinative of its punitive character. *Id.* Moreover, the punishment inflicted need not be a penal sanction, but could include, for example, the loss of employment or inability to practice a profession. *See e.g., United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). As the majority opinion describes, the concept of punishment for Bill of Attainder purposes has been broadened over time by the Supreme Court. After the Civil War the Court was faced with several statutory challenges which it held to be Bills of Attainder. For example, *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356 (1867) involved the conviction of a preacher who, after refusing to take an oath disclaiming sympathy to the Confederacy, was fined $500 and sentenced to jail. The Court held the statute banning clergymen from their positions if no oath was taken to be a Bill of Attainder, for it punished Cummings in its attempt to "[deprive] a person of the means of livelihood [and] ... rights, civil or political, previously enjoyed." *Id.* The Court emphasized the absence of any link between the prohibition on preaching by clergymen and taking the oath. The purpose of the Act, the Court held, was to punish a specific group of people (clergymen) for prior acts of sympathy or allegiance to the Confederacy. *Id.; see also Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 374–81, 18 L.Ed. 366 (1867) (striking down as a Bill of Attainder a federal statute requiring attorneys to take a similar oath before they were allowed to practice in federal court). The Court explicitly embraced this expansive trend of defining punishment in *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) where it asserted that "the Bill of Attainder clause was not to be given a narrow historical reading, ... but was instead to be read in light of the evil the Framers had sought to bar: *legislative punishment of any form or severity*, of specifically designated persons or groups."

*Id.* at 447, 85 S.Ct. at 1714 (emphasis added).

While the majority takes note of the expanding definition of punishment for Bill of Attainder purposes, it is unwilling to extend this concept to cover the facts of this case. I take issue with the majority's assertion that because extradition is not a criminal prosecution or punishment, *see e.g., Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976), it is not punishment for Bill of Attainder purposes. Despite this initial determination, the majority nevertheless properly goes on to examine the three tests enunciated by the Supreme Court to evaluate the punitive character of legislation: historical, functional, and motivational. *See Nixon*, 433 U.S. at 475–78, 97 S.Ct. at 2806–08. However, unlike Judge Ward and Judge Timbers who each correctly applied all three of these tests, the majority opinion has misapplied the functional and motivational tests.

### 1. *Historical.*

The historical test asks whether the legislative act imposes any punishments traditionally associated with bills of attainder, such as execution, imprisonment, banishment, or confiscation of property. *Id.* at 473–75, 97 S.Ct. at 2805–06. Both Judge Timbers and Judge Ward correctly found this test was not satisfied because the Supplementary Treaty resulted in none of the enumerated historical punishments. *See* 953 F.2d at 766–67. Consequently, both the district court and the panel's opinions analyzed the legislation under the other two tests.

### 2. *Functional.*

Under the functional test, a court must examine "whether the law under challenge, viewed in terms of type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475–76, 97 S.Ct. at 2806–07. "Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individ-

uals disadvantaged by the enactment was the purpose of the decisionmakers." *Id.*

A crucial question to be posed in conducting this inquiry is whether a legislative act is merely a regulation which incidentally affects a plaintiff. *Nixon*, 433 U.S. 425, 476 n. 40, 97 S.Ct. at 2781, 2807 n. 40. In making this determination, courts have examined the type and severity of deprivation, along with the absence or presence of choice which the parties were left with under the statute. For example, in *Selective Service* the Court held that a statute denying financial aid to male students who had not registered for the draft was not a Bill of Attainder, in part, because students were left with a viable remedy by which they could obtain aid. 468 U.S. at 853–56, 104 S.Ct. at 3355–57. By contrast, in the present case the deprivations imposed on McMullen, in terms of his inability to invoke the "political offense" defense and the reversal of the prior finding of extraditability, are significant. Moreover, these deprivations leave McMullen few options to defend his case, making extradition to Britain an inevitable eventuality.

It also cannot be ignored that while awaiting trial McMullen will be incarcerated in a British prison system that is home to many members of the PIRA. The PIRA's "Court of Inquiry" has already convicted McMullen and issued a sentence of death against him. Incarcerated members of the PIRA will surely not be squeamish about attempting to carry out this sentence. Even if no attempts are made on McMullen's life, the mere possibility of such an attempt no doubt constitutes a form of retribution. It is of little moment that McMullen will suffer this penance in Britain. Whether the rock comes to the pitcher or the pitcher comes to the rock is irrelevant. The pitcher breaks in either case. Characterizing this result as something other than punishment would be purely metaphysical. That which we call a rose by any other name would have a thorn.

The Government nevertheless contends that the purpose of the Treaty was to facilitate Britain's attempts to bring fugitive terrorists to justice and to preserve the American tradition of extradition if there is a judicial determination that the offense is political (under the narrower definition of the Supplementary Treaty). It argues that these goals are legitimate and nonpunitive, and are furthered by narrowing the political offense exception, applying it retroactively, and enhancing the court's role in scrutinizing the motives of the requesting party.

The panel agreed that these goals were legitimate and lawful, but also noted that a specific purpose of the Treaty was to reverse McMullen's case. 953 F.2d at 767. Both the panel and the district court correctly focused their inquiry on the Senate's desire to apply the Treaty retroactively even to those who had already successfully defended against extradition. Both courts correctly concluded that removing a defense previously asserted successfully by McMullen, thereby virtually assuring extradition, and by forcing McMullen to defend another proceeding, were burdens not necessary to further the Treaty's nonpunitive goals.

The majority concludes that because the Treaty furthers legitimate nonpunitive goals, it passes muster under the functional test. Moreover, the majority finds that forcing McMullen to defend a second extradition proceeding is not a severe hardship, as it is well-established that the Government can bring successive extradition proceedings against the same individual in the event prior attempts prove unsuccessful. *See e.g., United States v. Doherty*, 786 F.2d 491, 495 (2d Cir.1986); *Hooker v. Klein*, 573 F.2d 1360, 1365–66 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). However, not only must McMullen defend a second extradition, but he must do so without his only viable defense. This is an added burden that is not necessary to advance the Treaty's nonpunitive goals. That is, aiding Britain in extraditing terrorists and deterring such individuals from seeking refuge in the United States can be accomplished without effectively reversing three cases that have already been decided in the defendants' favor.

Therefore, I agree with the panel's conclusion that in reversing these cases the Senate was acting punitively. *See* 953 F.2d at 767–68.

### 3. *Motivational Test.*

Any ambiguity in applying the functional test is resolved when the Treaty is evaluated under the motivational test. This test focuses on "whether the legislative record evinces a congressional intent to punish." *Nixon,* 433 U.S. at 478, 97 S.Ct. at 2808. Moreover, "[i]n determining whether a legislature sought to inflict punishment on an individual, it is often useful to inquire into the existence of less burdensome alternatives by which the legislature could have achieved its legitimate non-punitive objectives." *Id.* at 482, 97 S.Ct. at 2810. Under these standards, the panel correctly concluded that a motive to punish McMullen for past blameworthy conduct can be imputed to Congress. *See* 953 F.2d at 767–68.

The fact that, as the majority stresses, extradition is not itself criminal punishment, is not controlling. Rather, as the panel noted, the inquiry should focus on whether the legislation is directed at an individual because of blameworthy conduct. *Id.* Here, the congressional debate is replete with references to McMullen and to a desire to reverse his denial of extradition. Moreover, the refusal to adopt the D'Amato amendment, combined with Senator Lugar's focus on particular individuals' conduct, is also persuasive evidence of a desire to "punish" these men for their conduct. In addition, as noted above, exempting McMullen and the other two individuals from the retroactive application of the Treaty would not seem to undermine the overall non-punitive Treaty goals.

Therefore, the panel was correct in concluding that under both the motivational and functional tests, the Supplementary Treaty inflicts punishment on McMullen.

### C. Judicial Trial.

A Bill of Attainder must also inflict punishment on an individual without the benefit of a judicial trial. McMullen's punishment was inflicted by the passage of the Treaty, *i.e.,* the Treaty sought to reverse the denial of his extradition by removing his only plausible defense. That the Treaty is designed to assure his extradition is demonstrated by Senator Lugar's comment that "had the Supplementary Treaty been in effect [in each of the cases where extradition had been denied based on the political offense exception], the political offense would, without question, have been decided against the defendant." *See* 132 Cong.Rec. at 16,587. Given that one of the purposes of the Treaty was to reverse McMullen's case, the panel correctly concluded that the Senate did not believe that the enhanced judicial role under the Treaty would afford any concrete protections to McMullen.

The Supplementary Treaty is therefore a Bill of Attainder. Accordingly, I would affirm the judgment of the district court in its entirety by reinstating the panel opinion.