CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Plaintiff,

v.

George E. PATAKI, in his official capacity as Governor of the State of New York; Maureen O. Helmer, in her official capacity as Chairman of the New York Public Service Commission; and Thomas J. Dunleavy, James D. Bennett, Leonard Weiss and Neal N. Galvin in their official capacities as commissioners of the New York Public Service Commission, Defendants.

Sheldon Silver, Speaker of the New York State Assembly, and Richard L. Brodsky, Member of the New York State Assembly, Intervenor–Defendants.

No. 00–CV–1230.

United States District Court, N.D. New York.

Oct. 10, 2000.

Charles E. McTiernan, Jr., Richard J. Giglio, Stephen Brewi, Scott Levinson, Consolidated Edison Co. of New York, Inc., New York, NY, for Plaintiff.

Edward M. Scher, Asst. Atty. Gen., Office of Attorney General, State of New York, Albany, NY, Jeffrey P. Mans, Office of the Attorney General, Albany, NY, for Defendant George E. Pataki.

Kevin M. Lang, New York State Public Service Commission, Department of Public Service, Albany, NY, for Defendants Maureen O. Helmer, Thomas J. Dunleavy, James D. Bennett, Leonard A. Weiss, Neal N. Galvin.

William F. Collins, New York State Assembly, Office of Counsel to the Majority, Albany, NY, for Defendants Richard L. Brodsky, Sheldon Silver.

### MEMORANDUM—DECISION AND ORDER

KAHN, District Judge.

Presently before the Court is Plaintiff's motion for a preliminary and permanent

injunction enjoining enforcement of Chapter 190 of the Laws of 2000.[1] For the reasons set forth below, Plaintiff's motion for a permanent injunction is GRANTED and its motion for a preliminary injunction is DENIED as moot.

## I. Background

### A. Indian Point Nuclear Power Plant

In 1972, Plaintiff purchased Model 44 steam generators from Westinghouse and installed them in its Indian Point 2 Nuclear Plant. In the mid to late 1970's, Westinghouse discovered that the metal alloy used to make the steam generator tubes in Model 44 and Model 51 steam generators was susceptible to corrosion. Approximately 30 nuclear plants in the United States were using these two types of generators at the time of this discovery. By January 1, 1997, 13 plants had replaced the defective generators, 16 had not, and one plant had ceased operation. Plaintiff did not replace its generators because of its mistaken belief that they could safely remain in operation for many more years.

On February 15, 2000, one of the tubes located in the Model 44 generators in the Indian Point Plant suffered a 2–inch tear that allowed radioactive fluid to leak through a tube wall and mix with water and steam in one of the steam generators. The Indian Point Plant was shut down pending review of the incident by the Nuclear Regulatory Commission. In the interim, Plaintiff has decided to replace the existing model 44 generators with replacement generators purchased in 1988. Until these replacement generators are in place, Plaintiff will have to purchase power from other utilities to replace the power lost due to the Indian Point Plant's inability to operate. These replacement costs will cost Plaintiff between $165 million and $200 million.

### B. New York Regulatory Framework

New York law allows the New York Public Service Commission ("PSC") to set energy rates that Plaintiff charges to its retail customers. These rates are set pursuant to the terms of a five-year Settlement Agreement approved by the PSC in 1997. Under the Agreement's terms, variations in costs Plaintiff incurs each month as it generates or purchases power can be passed onto its customers. The mechanism allowing this to occur is known as a Fuel Adjustment Clause ("FAC") (now called a Monthly Adjustment Charge).

PSC practice codified by state statute enables the PSC to retroactively adjust monthly utility rates charged to Plaintiff's customers (following a hearing) if the PSC determines that a utility like Plaintiff collected unreasonable charges under the FAC. When Plaintiff began reflecting the costs of Indian Point replacement power purchases in the FAC, the PSC commenced a proceeding to review the reasonableness of those charges. Had this proceeding determined that Plaintiff acted negligently in failing to replace the generators at Indian Point, the PSC would have ordered it to refund to its customers all costs associated with purchasing Indian Point replacement power.

### C. The Indian Point Law

The New York State Assembly drafted Chapter 190 of the Laws of 2000 ("Indian Point Law" or "Chapter 190" or the "Bill")

1. In relevant part, the law states:
 By continuing to operate steam generators known to be defective, and thereby increasing the risk of a radioactive release and/or an expensive plant outage, the Consolidated Edison Company failed to exercise reasonable care ... Therefore it would not be in the public interest for the company to recover from ratepayers any costs resulting from the February 15, 2000 outage at the Indian Point 2 Nuclear Facility.... [T]he New York State public service commission shall prohibit the Consolidated Edison Company from recovering from its ratepayers any costs associated with replacing the power from such facility ... [S]uch prohibition shall apply to the automatic adjustment mechanisms as well as base rates or any other recovery mechanism.

following the PSC's determination not to immediately suspend operation of Plaintiff's use of the FAC. The Law, approved by both the Assembly and the New York State Senate and signed by Governor Pataki, nullified the already commenced PSC review process by directly ordering it to prohibit Plaintiff from recovering from its ratepayers any costs associated with replacing power from the February 15, 2000 outage at the Indian Point Plant. The basis for this law is the legislative finding that "[b]y continuing to operate steam generators known to be defective ... the Consolidated Edison Company failed to exercise reasonable care on behalf of the health, safety and economic interests of its customers."

Plaintiff has asked this Court for a preliminary and permanent injunction enjoining enforcement of the Indian Point Law. Furthermore, Plaintiff has asked this Court to declare the Indian Point Law violative of (1) the Equal Protection Clause of the 14th Amendment; (2) the Procedural Due Process requirements of the 14th Amendment; (3) the Supremacy Clause; (4) the Contracts Clause contained in Article 1, § 10; and (5) the Prohibition on Bill of Attainder also contained in Article 1, § 10.

## II. Equal Protection

### A. Standard

■ The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 15. The clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). Legislation that does not restrict a fundamental right or employ a suspect classification, like the social and economic legislation at issue in this case, is presumed valid as long as it is rationally related to a legitimate government interest. *See Cleburne Living Center*, 473 U.S. at 440, 105 S.Ct. 3249; *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

■ This presumption of validity is buttressed by the notion that governments are entitled to wide deference when enacting social and economic legislation. *See Cleburne Living Center*, 473 U.S. at 439, 105 S.Ct. 3249. It is not the job of a federal court to ascertain the wisdom of a challenged statute or the utility of a questioned law. *See id.; Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 469, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). This does not mean that this Court is stripped of its power to substantively review the legitimacy of social and economic legislation. *See, e.g., Dep't of Agriculture v. Moreno*, 413 U.S. 528, 532, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (striking down a state statute which limited receipt of food stamps to households of related individuals while excluding households containing unrelated individuals as not rationally related to the stated purposes of the Food Stamp Act); *see generally Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982).

■ Rather, this Court must ascertain whether any set of facts exist that may reasonably justify the challenged law. *See McGowan v. Maryland*, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). If this Court determines that a reasonable justification for the law exists, it is required to uphold it. *See, e.g., Vacco v. Quill*, 521 U.S. 793, 807, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997) (finding a reasonable justification to warrant classifying terminally ill patients who refuse medical treatment differently from patients who wish to engage in physician assisted suicide). Conversely, if this Court determines that the legislature acted arbitrarily or classified Plaintiff upon some ground not having a fair and substantial relation to the object of the act, such that similarly situated persons are treated differently, it

must strike down the statute. *See Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *see also, F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

■ Defendants' lawyers contend that the legislature's determination to create a statute directed at Plaintiff is simply a response to its continued use of Westinghouse Model 44 steam generators. According to them, because Plaintiff is the only nuclear operator in New York using such generators, it is impossible for any other utility to pass similar costs to its ratepayers. Therefore, the legislature rationally determined that Plaintiff is a legitimate class of one.

■ Although this Court recognizes that after-the-fact rationalizations of statutory classifications by lawyers and judges may serve to uphold the validity of a challenged statute, *see McDonald v. Board of Election,* 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), this rationalization makes little sense when examined in light of the express legislative findings accompanying the statute. According to these findings, "the Con–Edison Company failed to exercise reasonable care on behalf of the health, safety and economic interests of its customers." Therefore, the legislature concluded, "it would not be in the public interest for the company to recover from ratepayers any costs resulting from the" Indian Point outage.

Hence, the Indian Point Law was not passed simply as a response to Plaintiff's continued use of Model 44 generators. Instead, it was passed in response to Plaintiff's failure to exercise reasonable care on behalf of the health, safety, and economic interests of its customers. As such, this Court must determine 1) whether any legitimate state interest underlies this finding and 2) if the classification of Plaintiff is rationally related to any such legitimate state interest.

**B. Legitimate State Interest**

■ To determine the legitimacy of a state interest, this Court should begin its inquiry by examining the statute itself and its legislative history. *See Johnson v. Robison,* 415 U.S. 361, 376, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). As long as the purposes of the statute can be easily ascertained from these sources, this Court should limit its inquiry to them. *See id.* If these purposes do not offend specific constitutional prohibitions, "when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 238, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (quoting *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954).)

The stated purposes of the Indian Point Law are found in Section 1 of the statute and the accompanying memorandum in support of the law. According to Section 1 of the statute, it is not in the public interest for the company to recover from ratepayers any costs resulting from Plaintiff's failure to exercise reasonable care on behalf of its customers. The memorandum in support of the law declares that the purpose of the bill is to "protect ratepayers from costs related to imprudence by Con–Edison Company (Con–Edison) in relation to a recent radiation leak at the Indian Point 2 Nuclear Facility."

This Court does not dispute the legitimacy of the State's laudable desire to deter negligence at nuclear power plants, protect rate payers, and regulate utility rates. *See Duquesne Light Co. v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). What this Court does view as problematic is the completely irrational manner in which the statute classifies Plaintiff in an effort to further these purposes.

**C. Rational Relation of Legislature's Classification**

■ A classification is rationally related to a legitimate government interest

as long as it does not place persons into "different classes on the basis of criteria wholly unrelated to the objective of the state." *Reed*, 404 U.S. at 76, 92 S.Ct. 251. As long as the classification is "reasonable, not arbitrary, and [rests] upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike," this Court will uphold it. *Id.* (quoting *F.S. Royster Guano Co.*, 253 U.S. at 415, 40 S.Ct. 560.) However, as this Court has stated, if the classification is "so under-inclusive" that it bears no relation to the statute's purpose, the Court will strike it down. *Long Island Lighting Co. v. Cuomo*, 666 F.Supp. 370, 423 (N.D.N.Y.1987).

In the instant case, the Court notes that the Indian Point Law singles out Plaintiff with unparalleled specificity and forbids it from recovering any costs associated from the Indian Point 2 shut-down. While it may be true that Plaintiff should not recover costs associated from the Indian Point 2 shut down, the Court fails to see how Plaintiff's allegedly negligent action here justifies the creation of a statutory class aimed directly at it. In particular, the Court sees absolutely no difference between the allegedly negligent conduct at issue in this case and any other case of nuclear power plant negligence normally brought before the PSC.

For example, had the New York State Electric and Gas Corporation engaged in negligent operation of its Nine Mile Point 2 nuclear power plant, it would have been entitled to pass replacement costs onto its customers until the PSC made a determination that the costs were incurred because of imprudence. Further, such a determination would be reviewable pursuant to Article 78 of the CPLR in the state courts. Yet, according to Defendants, Plaintiff was denied this same exact right because its negligence involved the use of a specific model of generator. In essence, Defendants want this Court to accept the premise that because only Plaintiff could be negligent as to these specific model generators it did not have to draft a statute that applied to other similarly situated nuclear power plant operators.

This Court rejected this argument long ago. Writing in *Long Island Lighting Co.*, Chief Judge Munson stated:

> The fact that the terms of a statute, if drafted in such a way that it applied to all like-situated individuals, would in the legislature's estimation actually affect only one of those individuals does not justify drafting the statute in such a way that it applies only to that individual and not to the others who are similarly situated. This is akin to a small community, believing that one particular individual is prone to steal automobiles, passing an ordinance prohibiting that individual from stealing automobiles but not imposing a similar prohibition on all others in the community. Clearly, such an ordinance would offend the "element of neutrality that must always characterize the performance of the sovereign's duty to govern impartially."

*Id.* at 424 (citations omitted). Consequently, this Court concludes that the classification of Plaintiff based upon its use of Model 44 generator is arbitrary, does not rest upon some ground of difference fairly and substantially related to the object of the statute, and treats similarly situated nuclear power plant operators differently.

■ Moreover, this Court notes that there is some evidence to indicate that the articulated purpose underlying this arbitrary classification is a mere pretext for an impermissible purpose offending other constitutional provisions. In particular, this Court notes that the legislative record is replete with references that the Indian Point Law was passed to punish Plaintiff for its negligence and existing high rates.[2] If this legislative classification was upheld on the ground that punishing Plaintiff was rationally related to the statute's purposes,

---

2. The punitive purpose of Chapter 190 is discussed below in Part III. B.

it would violate the most basic tenet of the Equal Protection Clause.

■ As the Supreme Court has emphatically stated, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate government interest." *United States Department of Agriculture v. Moreno*, 413 U.S. at 534, 93 S.Ct. 2821. New York State's legislature is not free to "pick and choose only a few to whom they will apply legislation and thus [ ] escape the political retribution that might be visited upon them if larger numbers were affected." Laurence Tribe, American Constitutional Law 998 (1978) (quoting *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 116, 69 S.Ct. 463, 93 L.Ed. 533 (1949)). For these reasons, the Indian Point Law violates the Equal Protection Clause of the Fourteenth Amendment of the Constitution.

This Court has no doubt that if the New York State Legislature passes a law creating a higher standard of care for operators of nuclear plants in comparison to other types of energy plants that applies to all similarly situated nuclear plant operators, it would pass constitutional muster. Moreover, this Court has no doubt that if the PSC ultimately determines that Plaintiff acted negligently in failing to replace the generators at Indian Point 2 and orders Plaintiff to refund all replacement costs to its customers, that too would pass constitutional muster. Unfortunately, neither of these two avenues were taken, leaving this Court no choice but to strike down the Indian Point law as violative of the Equal Protection Clause.

**3.** Article I, Section 9, applicable to Congress, states that "[n]o Bill of Attainder or ex post facto Law shall be passed." Section 10 applies the same rule to the States.

**4.** Although the Supreme Court has not explicitly held so, it has stated in dicta that the Bill of Attainder Clause applies to corporate enti-

## III. Bill of Attainder

■ Plaintiff also argues that the Indian Point Law violates the Constitutional Prohibition against passing any bill of attainder. Article I, Section 10 of the Constitution provides that "[n]o State shall ... pass any bill of attainder."[3] An unlawful bill of attainder is any law "that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

■ Historically, the bill of attainder was a parliamentary device used in sixteenth, seventeenth and eighteenth century England to sentence to death one or more specified persons for attempting or threatening to attempt to overthrow the government. *See United States v. Brown*, 381 U.S. 437, 441, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). However, the Supreme Court has held that:

> the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature.

*United States v. Brown*, 381 U.S. at 442, 85 S.Ct. 1707. The *Brown* Court went on to hold that "[t]he Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons."[4] *Brown*, 381 U.S. at 445, 85 S.Ct.

ties as well as to individuals. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 n. 9, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). It is this Court's opinion that such an interpretation, although not explicitly adopted by the Supreme Court, is correct given the broad intent of the Clause and it is, accordingly, adopted.

1707; *see also McMullen v. United States,* 989 F.2d 603, 607 (2d Cir.1993).

The Court's opinion and the Clause's important purpose are borne out in the writings of the Framers themselves. James Madison wrote:

> The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.

The Federalist, No. 47, at 373–74 (Hamilton ed. 1880). The *Brown* court also cited the writings of Madison and Alexander Hamilton in finding that:

> [t]he authors of the Federalist Papers took the position that although under some systems of government (most notably the one from which the United States had just broken), the Executive Department is the branch most likely to forget the bounds of its authority, in a representative republic where the legislative power is exercised by an assembly which is sufficiently numerous to feel all the passions which actuate a multitude; yet not so numerous as to be incapable of pursuing the objects of its passions, barriers had to be erected to ensure that the legislature would not overstep the bounds of its authority and perform the functions of the other departments.

*Brown,* 381 U.S. at 443–44, 85 S.Ct. 1707 (quotations omitted) (citing generally The Federalist, Nos. 47 (Madison), 48 (Madison), 49 (Hamilton), 51 (Hamilton) and 78 (Hamilton)). Madison also stated that "[b]ills of attainder ... are contrary to the first principles of the social compact and to every principle of sound legislation," The Federalist, No. 44, at 282, and, quoting Montesquieu, wrote that "were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislature," The Federalist, No. 47, at 303.

Additionally, the *Brown* Court observed that a legislative body, which is by its very nature dependent upon the people, is rendered "liable to be peculiarly susceptible to popular clamor" and is "not properly constituted" to take such actions. *Brown,* 381 U.S. at 445, 85 S.Ct. 1707 (quoting 1 Cooley, Constitutional Limitations, pp. 536–37 (8th ed.1927)). With this fear in mind, the Court held, the Framers banned bills of attainder in order to limit legislatures "to the task of rulemaking." *Id.* at 446, 85 S.Ct. 1707. Hence, the Supreme Court has always recognized the Bill of Attainder Clause as an important piece of the constitutional framework ensuring the separation of powers, one of our nation's most deeply imbedded principles. *See, e.g., Fletcher v. Peck,* 6 Cranch 87, 10 U.S. 87, 138, 3 L.Ed. 162 (1810) (Chief Marshall holding that "[i]t is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments"); *Plaut,* 514 U.S. at 242, 115 S.Ct. 1447 (noting that "the Constitution's 'separation-of-powers' principles reflect, in part, the Framers' concern that a legislature should not be able unilaterally to impose a substantial deprivation on one person" and that this principle was expressed "both in specific provisions, such as the Bill of Attainder Clause, and in the Constitution's general allocation of power") (citations omitted). It is with these principles in mind that the Court will apply the Bill of Attainder Clause to the facts of this case.

## A. Standard

 It is well established that, in order to determine whether a legislative enactment is an unlawful bill of attainder, the Court must determine whether the challenged law inflicts punishment on specifically designated individuals or entities without the benefit of judicial trial. *See Brown,* 381 U.S. at 448–49, 85 S.Ct. 1707 (citing *United States v. Lovett,* 328 U.S. 303, 315–16, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946)). In other words, a law is a bill of attainder if it satisfies "a

three-pronged conjunctive test that considers whether the act: (1) imposed punishment, (2) specified the persons, and (3) lacked the protection of judicial process." *McMullen,* 989 F.2d at 611 (citing *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group,* 468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984)).

 Chapter 190 clearly satisfies the second and third prongs of this test. The specificity prong is satisfied if "the challenged act singles out a person or identifiable group either by name or by describing those affected by the act 'in terms of conduct which, because it is past conduct, operates only as a designation of particular persons.'" *Long Island Lighting Co.,* 666 F.Supp. at 403 (quoting *Communist Party of United States v. Subversive Activities Control Bd.,* 367 U.S. 1, 86, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961)). Chapter 190 takes the extraordinary step of naming Plaintiff as the solitary target of the legislation. Consequently, there is no doubt that the Indian Point Law satisfies the specificity prong of the bill of attainder test.

 Likewise, it is clear that Plaintiff was not accorded judicial process in this case. Quite the contrary, Chapter 190 was passed following the ordinary legislative process. Plaintiff was given no judicial or quasi-judicial protections to fight the legislature's determination that it "failed to exercise due care" in failing to replace the generators at Indian Point 2.

## B. Punishment

 The harder question for the Court is whether the Indian Point Law inflicts "punishment." This is a fact-specific inquiry, *McMullen,* 989 F.2d at 612, and each case must turn "'on its own highly particularized context,'" *Selective Service,* 468 U.S. at 852, 104 S.Ct. 3348 (quoting *Flemming v. Nestor,* 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)). The Supreme Court has developed a series of tests to be used in deter-

mining whether the legislative enactment in question inflicts "punishment." Courts must consider: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Service,* 468 U.S. at 852, 104 S.Ct. 3348 (quoting *Nixon,* 433 U.S. at 475–76, 97 S.Ct. 2777); *see McMullen,* 989 F.2d at 612. These tests are referred to as the "historical," "functional" and "motivational" tests, respectively. *See id.* Although it need not do so in order to be found violative of the Bill of Attainder Clause, Chapter 190 satisfies all three of these tests.

### 1. *Historical Test*

 The "historical" test asks whether the enactment imposes a punishment "traditionally judged to be prohibited by the Bill of Attainder Clause." *Nixon,* 433 U.S. at 475, 97 S.Ct. 2777. Among those forms of punishment traditionally prohibited are imprisonment, banishment, execution, punitive confiscation of property and bars against participation in specified employments or vocations. *See id.*

In *Long Island Lighting Co.,* this Court observed that the Bill of Attainder Clause:

has been applied only to legislation closely paralleling the historical characteristics of common law bills of attainder and bills of pains and penalties, the most important of which is a design "to inflict[ ] its deprivation upon the members of a political group thought to present a threat to national security."

*Long Island Lighting Co.,* 666 F.Supp. at 403 (quoting *Brown,* 381 U.S. at 453, 85 S.Ct. 1707). In that case, the plaintiff, in circumstances similar to those found here, claimed that acts passed by the New York State Legislature "imposed economic disabilities and deprivations" on it, constituting "punitive confiscation" of its property

interests. *Id.* at 404, 85 S.Ct. 1707. The Court rejected the plaintiff's arguments because the acts provided for just compensation for any property lost and, "most importantly", because the challenged acts were "not '[g]enerally addressed to persons considered disloyal to the Crown or State.'" *Id.* (quoting *Brown,* 381 U.S. at 474, 85 S.Ct. 1707).

In this case, defendant PSC has estimated the total costs of the sanction imposed on Plaintiff at $162 million through August 31, 2000. As new steam generators will not be installed for at least a few more months, this number could eventually be much larger. Plaintiff is not offered any compensation under the terms of Chapter 190. Moreover, as discussed below, the Court finds that these sanctions were imposed for punitive purposes by the legislature. Accordingly, Chapter 190 certainly imposes "punitive confiscation of property" on Plaintiff.

Plaintiff, of course, cannot argue that it is a "political group thought to present a threat to national security." *Brown,* 381 U.S. at 453, 85 S.Ct. 1707. However, to suggest that, in order to fall within the traditional prohibitions of the Bill of Attainder Clause, an act must punish only members of such a class is far too cramped a reading of the standards established by the Supreme Court. Indeed, it has been noted that "[t]he concept of punishment under the bill of attainder clause has always been a fairly broad one." Laurence Tribe, American Constitutional Law § 10–4, at 642 n.9 (2d ed.1988).

As discussed above, it is well established that the Bill of Attainder Clause is not to be construed narrowly, but rather as an important tool in assuring the separation of powers. *See Brown,* 381 U.S. at 442, 85 S.Ct. 1707. The Framers were concerned with occasions on which the legislature could take advantage of the existing political landscape to usurp the functions of its fellow branches, not just those in which the subject of the legislation is considered a threat to the State. Consid-

ering this goal, the Clause's historical scope properly includes actions against any person or persons who are so unpopular politically that the legislature may take unilateral action against them without fear of political retribution. This is not to say that any legislation imposing limitations or restrictions on individuals or entities is suspect. Such a construction of the Bill of Attainder Clause would paralyze legislative activity. Instead, the confiscation in question must be punitive in nature, as is the case here.

Plaintiff, a powerful utility, although not the prototypical powerless victim of constitutional overreaching by any stretch of the imagination, is clearly politically unpopular. This is particularly so when it is accused of exposing the public to the risk of nuclear leaks and of unjustly passing along millions of dollars in resultant costs to the rate payers. Indeed, this was not lost on the legislature, as one Senator proclaimed during debate of the bill that it made for "great politics" but "horrible policy." Accordingly, it fits nicely into the class of persons traditionally protected from bills of attainder.

### 2. *Functional Test*

Even if Chapter 190 does not satisfy the "historical" test, the Supreme Court has "'emphatically rejected the argument that the [Bill of Attainder Clause] outlawed only a certain class of legislatively imposed penalties.'" *McMullen,* 989 F.2d at 607 (quoting *Brown,* 381 U.S. at 447–48, 85 S.Ct. 1707). In *Nixon,* the Court held that it had not "precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." *Nixon,* 433 U.S. at 475, 97 S.Ct. 2777. Accordingly, the Court "often has looked beyond mere historical experience and has applied a functional test of the existence of punishment, analyzing whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to

further nonpunitive legislative purposes." *Id.* at 475–76, 97 S.Ct. 2777. Upon review of the stated purpose of Chapter 190, the sanctions it actually imposes, and the circumstances surrounding its enactment, the Court finds that it cannot reasonably be said to further nonpunitive goals. To the contrary, it is apparent that the purpose of Chapter 190 is to punish Plaintiff for its actions.

As discussed above, the statute's stated purpose is to "protect ratepayers from costs related to imprudence by" Plaintiff in relation to the leak at Indian Point. Although, on its face, such a purpose does not appear punitive, a number of important factors indicate that the legislature was indeed intent on punishing Plaintiff for its prior actions.

First and foremost, this Court's conclusion that the legislature's "class of one" is not rationally related to the stated purpose of the bill makes it suspect under the Bill of Attainder Clause. Although not determinative of the issue, the legislature's explicit naming of one entity to suffer the sanctions Chapter 190 inflicts, when that classification is not rational, bespeaks an intent to punish the named entity. As Justice Kennedy stated in his *Nixon* concurrence, "the very specificity of the statute would mark it is punishment, for there is rarely any valid reason for such narrow legislation; and normally the Constitution requires [legislatures] to proceed by general rulemaking rather than deciding individual cases." *Nixon*, 433 U.S. at 485–86, 97 S.Ct. 2777.

In *Nixon*, the Supreme Court held that "[i]n determining whether a legislature sought to inflict punishment on an individual, it is often useful to inquire into the existence of less burdensome alternatives by which that legislature ... could have achieved its legitimate nonpunitive objectives." *Id.* at 482, 97 S.Ct. 2777. In this case, the legislature had a readily available alternative that would have achieved the same goal in a considerably less burdensome fashion. The existing regulatory framework would have prevented Plaintiff from passing costs resulting from "imprudent" actions onto its customers. Indeed, the PSC had already begun proceedings to review the prudency of the charges surrounding the leak at Indian Point.

Again, this reality was not lost on the legislature. One senator argued during debate of the bill that the legislature was making its determination without following "old fact gathering procedures [it] generally" uses and that it was performing those functions which it had "hired judges to do." Moreover, the Chairman of the PSC, defendant Maureen Helmer, wrote to the sponsors of the bill making clear that the PSC was in the process of performing a prudency review. The letter also warned the legislators of the constitutional infirmity of the proposed bill. In spite of this, the legislature took upon itself the role of adjudicator and eschewed the less burdensome alternative of a quasi-judicial determination by the PSC followed by review in the courts.

The language used by senators in debating Chapter 190 also strongly suggests a punitive intent in its passage. It is clear from the record that the legislature made particularized findings of fact that Plaintiff engaged in blameworthy actions in the past and proceeded to institute appropriate sanctions. The sponsors and other legislators used language such as "punish" and "penalize" and "has done a terrible thing here." [5]

---

5. For example, during Senate debates on Chapter 190 Senator Velella declared:

> Con Edison has done a terrible thing here. They have negligently performed their function as a utility company. They failed to install a generator that was given to them, to replace a defective one. And they put lives at risk. Now, nobody wants to come in and swear to the fact, yes we did that. I doubt very seriously if anybody from Con Ed ever will swear to the fact that they did it. But they did it. And Velella's law is going to stop them and punish them.

Further, the Supreme Court has found that "[i]t would be archaic to limit the definition of 'punishment' to 'retribution.' Punishment serves several purposes; retributive, rehabilitative, deterrent—and preventive." *Brown,* 381 U.S. at 458, 85 S.Ct. 1707. Here, Chapter 190 itself provides that its effect will be to "discourage [nuclear operators from] risking public health and safety." That the legislature took this action against a single entity to deter future similar action is unmistakable evidence of punitive intent. As discussed this legislative intent is commendable. A general rule effecting such an intent by proscribing greater penalties for such actions, as are alleged here, would almost certainly pass constitutional muster. However, the legislature did not do this. Instead it levied punishment against a single entity and in the process subsumed the powers of all three branches of government.

Finally, it is critical to note that counsel for defendant PSC acknowledged at oral argument that, had Plaintiff replaced the Westinghouse generators in 1988, the costs would probably have been passed onto the ratepayers with no interference from the PSC. Many of the same costs resulting from the recent leak would have been incurred if the generator had been replaced in 1988. Moreover, purchased power costs during planned refueling and maintenance outages, even when they coincide with imprudently caused outages, are recoverable by the utility. That Plaintiff is not allowed to recover these costs by Chapter 190, makes it clear that the legislature is acting to punish Plaintiff for what was deemed to be its blameworthy conduct in continuing to operate with the Westinghouse generators.

### 3. *Motivational Test*

 Finally, under the "motivational" test, the Court must ascertain "wheth-

er the legislative record evinces a congressional intent to punish." *Nixon,* 433 U.S. at 478, 97 S.Ct. 2777. As discussed above, the legislative record and all of the circumstances surrounding Chapter 190's enactment make it clear that the New York State Legislature was acting with the intent of punishing Con Edison.

In the final analysis, it is apparent to the Court that Chapter 190 constitutes exactly the kind of legislative action that the Bill of Attainder Clause was drafted to prevent. Having determined that a politically unpopular entity may have acted wrongfully, rather than setting "forth a generally applicable rule ... and leave to the courts and juries the job of deciding what [entities] have committed the specified acts or possess the specified characteristics," the legislature took it upon itself to determine the entity's guilt and to impose the sanction it deemed appropriate. *Brown,* 381 U.S. 437, 85 S.Ct. 1707. In short, the legislature "was intent on encroaching on the judicial function of punishing an individual for blameworthy offenses." *Nixon,* 433 U.S. at 479, 97 S.Ct. 2777. Consequently, the Court finds that the Indian Point Law violates the constitutional prohibition against enacting a bill of attainder.[6] As the Court has determined that it is violative of the Equal Protection Clause and the Bill of Attainder Clause, Defendants are enjoined from taking any action to implement or enforce Chapter 190.

### IV. Conclusion

Accordingly, it is hereby

ORDERED that Plaintiff's motion for a permanent injunction is GRANTED; it is further

ORDERED that Defendants are enjoined from taking any action to implement or enforce Chapter 190 of the Laws of 2000; it is further

---

**6.** Because this Court determined that the Indian Point Law is unconstitutional on equal protection and bill of attainder grounds, it will not address Plaintiff's other constitutional

claims. Furthermore, because the Court has granted a permanent injunction, Plaintiff's motion for a preliminary injunction is denied as moot.

ORDERED that Plaintiff's motion for a preliminary injunction is DENIED as moot; and it is further

ORDERED that the Clerk shall serve copies of this Order by United States Mail upon the attorneys for the parties appearing in this action.

IT IS SO ORDERED.