292 F.3d 338
 CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Plaintiff-Appellee,
v.
George E. PATAKI, in his official capacity as Governor of the State of New York, Maureen O. Helmer, in her official capacity as Chairman of the New York State Public Service Commission, Thomas J. Dunleavy, James D. Bennett, Leonard D. Weiss and Neal N. Galvin in their official capacities as Commissioners of the New York State Public Service Commission, Defendants-Appellants,
Richard L. Brodsky, New York State Assembly Member and Sheldon Silver, New York State Assembly Speaker, Intervenors-Defendants-Appellants.
 Docket No. 00-9358(L).
 Docket No. 00-9426(CON).
 Docket No. 00-9442(CON).
 United States Court of Appeals, Second Circuit.
 Argued May 21, 2001.
 Decided June 5, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Laura Etlinger, Assistant Solicitor General of the State of New York (Eliot Spitzer, Attorney General of the State of New York, Daniel Smirlock, Deputy Solicitor General of the State of New York, Peter H. Schiff, Senior Counsel, on the brief), Albany, NY, for Defendant-Appellant Governor Pataki.
 Lawrence G. Malone, Public Service Commission of the State of New York (Diane T. Dean, on the brief), Albany, NY, for Defendants-Appellants Commissioners of the Public Service Commission.
 Richard L. Brodsky, New York State Assembly, Counsel to the Majority (Rosemary Perez Jaquith, on the brief), Albany, NY, for Intervenors-Defendants-Appellants.
 Guy Miller Struve, Davis, Polk & Wardwell (James D. Liss, Florence A. Crisp, Zachary D. Stern, Davis, Polk & Wardwell, Charles E. McTiernan, Jr., Richard J. Giglio, Scott A. Levinson, Roxana Barsalona, Consolidated Edison Company of New York, Inc., on the brief), New York, NY, for Plaintiff-Appellee.
 John C. Rice, Rice & Justice (Lawrence P. Justice, Bradley F. Rice, on the brief), Albany, NY, for Amicus Curiae Business Council of New York State, Inc.
 Michael F. McBride, LeBoeuf, Lamb, Greene & MacRae, LLP (Bruce W. Neely, Martin G. Malsch, John W. Lawrence, LeBoeuf, Lamb, Greene & MacRae, LLP, Edward H. Comer and Henri Bartholmot, Edison Electric Institute, Robert W. Bishop and Ellen C. Ginsberg Nuclear Energy Institute, on the brief) Washington, DC, for Amici Curiae Edison Electric Institute and Nuclear Energy Institute.
 Before: WALKER, Chief Judge, JACOBS, Circuit Judge, LARIMER, Chief District Judge.*
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Defendant state officials appeal from a judgment of the United States District Court for the Northern District of New York (Lawrence E. Kahn, District Judge) permanently enjoining enforcement of a New York state statute against plaintiff Consolidated Edison Company of New York, Inc. ("Con Ed") on the grounds that the statute violated the Equal Protection Clause of the Fourteenth Amendment and the Bill of Attainder Clause of Article I, Section 10 of the United States Constitution. We affirm solely on the basis of Art. I, § 10, but remand to the district court to correct a scrivener's error in the judgment.
 
 BACKGROUND
 
 2
 Plaintiff Con Ed is a public utility that provides electrical power to New York City. Among Con Ed's power plants is the Indian Point 2 Nuclear Generating Facility ("IP2") located in Westchester County, New York. The statute at the heart of this appeal was enacted in response to a power outage at IP2 caused by a defective generator.
 
 
 3
 Until recently, IP2 produced electricity with four "Model 44" steam generators that Con Ed had purchased from the Westinghouse Corporation ("Westinghouse") in 1972. In the late 1970s, Westinghouse learned that the steam generator tubes on both its Model 44 and 51 steam generators were subject to corrosion and failure. By 1997, seven of the eight nuclear power plants using the Model 44 had replaced their generators. Although other power plants apparently continued to use the similarly flawed Model 51 steam generators, only IP2 continued to use the flawed Model 44 generators. Con Ed purchased replacement generators for IP2 in 1985, but, prior to the incident at issue in this litigation, had never installed them.
 
 
 4
 On February 15, 2000, a steam tube in one of IP2's Model 44s developed a crack which released radioactive steam into the surrounding nonradioactive water that is converted to steam to turn IP2's power-generating turbines. A subsequent investigation by the federal Nuclear Regulatory Commission ("NRC") and the New York State Public Service Commission ("PSC" or "the Commission") revealed no evidence of elevated radiation levels offsite due to the incident. The cracked tube was promptly discovered and Con Ed took IP2 offline to replace the generator. By January 2001, it had finished replacing the damaged generator with one purchased in 1985 and restarted IP2. To cover electricity demand while IP2 was offline, Con Ed was forced to purchase electricity from other sources.
 
 
 5
 Con Ed operates IP2 in a complex regulatory environment. The public health and safety aspects of its operations are regulated by the NRC under the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq. (1994). The rates that Con Ed charges its customers are regulated by the PSC, an independent state regulatory body created early in the twentieth century.
 
 
 6
 A 1997 settlement agreement resolved a number of outstanding disputes between Con Ed and the PSC that have no bearing on this appeal. The agreement amended Con Ed's rate and was adopted in the form of a rate order by consent. Of relevance to this appeal, the agreement includes a so-called "fuel adjustment clause" ("FAC"), which allows Con Ed to pass certain costs along to its ratepayers in the form of temporary rate increases. Con Ed's authority to pass costs through to ratepayers under the FAC is subject to statutory review by the PSC to determine whether those costs are prudently or "reasonably" incurred, in order to ensure just and reasonable rates. N.Y. Pub. Serv. Law § 66(12)(k) (2001); see Long Island Lighting Co. v. Pub. Serv. Comm'n, 134 A.D.2d 135, 523 N.Y.S.2d 615, 620 (1987). The PSC is empowered to bar Con Ed from passing imprudently incurred costs along to ratepayers and to force the utility to refund imprudently incurred costs already recouped. N.Y. Pub. Serv. Law § 66(12)(k) (2001).
 
 
 7
 Pursuant to the FAC, Con Ed increased its rates to incorporate the cost of purchasing replacement electricity and the other costs associated with the outage. Soon after the incident, the PSC staff began a prudence investigation of the IP2 outage, and on March 30, 2000, the PSC itself initiated a prudence review. It is our understanding that this review is still incomplete as of the issuance of this opinion.
 
 
 8
 On February 18, 2000, three days after the outage, the New York State Assembly issued a notice of a joint public hearing of the Assembly Committees of Energy, Environmental Conservation, and Corporations, Authorities, and Commissions, to be held on a variety of topics related to the outage and Con Ed's operation of IP2. The notice listed potential topics including: the environmental effects of the incident, deterioration of facilities at IP2, the need for greater regulatory oversight of nuclear power in New York, and the potential sale of the IP2 plant. The hearing was held on March 3, 2000, and it covered the range of topics listed in the notice. Con Ed's Chief Operating Officer, J. Michael Evans, and its Vice President of Maintenance and Construction, Stephen Quinn, testified. They later supplemented their testimony in a six-page letter to several members of the committee.
 
 
 9
 On March 20, 2000, intervenors-defendants Representatives Brodsky and Silver introduced the bill that is the subject of the present lawsuit. See A. 10096, 2000 Assembly (N.Y.2000). One week later, on March 27, the Assembly and Senate passed the bill without amendment. Governor Pataki signed it into law on August 8 as Chapter 190 of the Laws of 2000 ("Chapter 190"). See Act of Aug. 8, 2000, ch. 190, 2000 N.Y. Laws, (hereinafter, 2000 N.Y. Laws 190). Chapter 190 reads, in full, as follows:
 
 
 10
 § 1. Declaration of legislative findings. The operator of a nuclear generating facility has a high duty of care to protect the health, safety and economic interests of its customers. Rate regulation of nuclear operators should discourage the taking of risks with regard to potential threats to public health and safety.
 
 
 11
 By continuing to operate steam generators known to be defective, and thereby increasing the risk of a radioactive release and/or an expensive plant outage, the Consolidated Edison Company failed to exercise reasonable care on behalf of the health, safety and economic interests of its customers. Therefore it would not be in the public interest for the company to recover from ratepayers any costs resulting from the February 15, 2000 outage at the Indian Point 2 Nuclear Facility.
 
 
 12
 § 2. With respect to the February 15, 2000 outage at the Indian Point 2 Nuclear Facility, the New York state public service commission shall prohibit the Consolidated Edison Company from recovering from its ratepayers any costs associated with replacing the power from such facility. Such prohibition shall apply to any such costs incurred until the conclusion of such outage, or incurred at any time until all defective steam generation equipment at the facility has been replaced, whichever occurs later. Such prohibition shall apply to automatic adjustment mechanisms as well as base rates or any other rate recovery mechanism. The commission shall order the company to refund any such costs which have been recovered from ratepayers.
 
 
 13
 § 3. This act shall take effect immediately.
 
 
 14
 The PSC has estimated that Con Ed would have been able to pass on to its customers approximately $250 million in increased costs that Chapter 190 requires it to internalize.
 
 
 15
 On August 14, 2000, Con Ed filed suit in the District Court for the Northern District of New York, seeking a declaratory judgment and permanent injunction barring enforcement of the statute on various constitutional grounds and on August 17 moved for a preliminary injunction. Con Ed alleged that the statute violated the Equal Protection Clause of the Fourteenth Amendment, the Bill of Attainder Clause of Article I, Section 10, the Due Process Clause of the Fourteenth Amendment (alleging a violation of procedural due process and an uncompensated taking), the Supremacy Clause, and the Contracts Clause of Article I, Section 10. On September 6, 2000, the district court granted a motion by Representative Brodsky, a member of the Assembly, and Representative Silver, the speaker of the Assembly, to intervene in the suit.
 
 
 16
 In a memorandum order dated October 10, 2000, the district court granted Con Ed's request for a permanent injunction and denied as moot Con Ed's motion for a preliminary injunction. Con Ed v. Pataki, 117 F.Supp.2d 257 (N.D.N.Y.2000). The district court agreed with Con Ed that the statute violated the Equal Protection Clause, finding that Chapter 190 was not rationally related to the state's legitimate interest in deterring negligence at nuclear power plants. Id. at 262-65. The district court also held that Chapter 190 constituted an impermissible Bill of Attainder because the statute named Con Ed and was the product of a legislative intent to punish Con Ed. Id. at 265-71. The court expressly refused to reach Con Ed's other constitutional claims. After judgment was entered on December 4, 2000,[1] the defendants appealed.
 
 DISCUSSION
 
 17
 Because we conclude that Chapter 190 is an unconstitutional bill of attainder, we affirm the district court. We need not and do not address Con Ed's other constitutional theories.[2]
 
 
 18
 I. The Bill of Attainder Clause of Article I, Section 10
 
 
 19
 The Constitution includes two clauses prohibiting enactment of "bills of attainder": Section 9 applies to Congress, Section 10 to the states. See U.S. Const. art. I, §§ 9, 10. The history of bills of attainder and of pains and penalties in England,[3] which gave rise to the constitution prohibitions in § 9 and § 10, has been aptly described elsewhere, and we see no need to reiterate it here. See In re Extradition of McMullen, 989 F.2d 603, 604-06 (2d Cir.1993) (in banc). Briefly stated, a constitutionally proscribed bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); see also United States v. Lovett, 328 U.S. 303, 315, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) ("[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."). Put another way, the Clause bars the imposition of punishment resulting from "trial by legislature." United States v. Brown, 381 U.S. 437, 442, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).
 
 
 20
 Under the definition quoted above from Nixon, a statute can be a bill of attainder only if (1) it "determines guilt and inflicts punishment," (2) "upon an identifiable individual," and (3) "without provision of the protections of a judicial trial." Nixon, 433 U.S. at 468, 97 S.Ct. 2777. In the present case, the lack of a judicial trial is incontrovertible. Chapter 190 was enacted by the state legislature using purely legislative processes, without any additional protections akin to those present in a judicial trial. At issue, then, are only the questions of whether (1) Con Ed, singled out as it was by Chapter 190, is an "individual" that may invoke the protection of the Clause, (2) Chapter 190 "determines guilt," and (3) Chapter 190 "inflicts punishment." We answer all three questions in the affirmative.[4]
 
 
 21
 A. The Clause's Applicability to Corporations
 
 
 22
 Chapter 190 unquestionably singles out Con Ed: the utility is expressly named in the statute. The legislator defendants argue, however, that the Bill of Attainder Clause applies only to legislation that targets natural persons, not corporations such as Con Ed. We disagree.
 
 
 23
 Although a corporation is "an artificial being, invisible, intangible, and existing only in contemplation of law," Dartmouth Coll. v. Woodward, 17 U.S. (4 Wheat.) 518, 636, 4 L.Ed. 629 (1819), a wide variety of constitutional rights may be asserted by corporations. See, e.g., Metro. Life Ins. Co. v. Ward, 470 U.S. 869, 881 n. 9, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (equal protection); Marshall v. Barlow's, Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (reasonable search and seizure); United States v. Martin Linen Supply Co., 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977) (double jeopardy); Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (freedom of speech). Nevertheless, not all constitutional protections apply to corporations or apply as fully as they do to natural persons. See, e.g., United States v. Morton Salt Co., 338 U.S. 632, 651-52, 70 S.Ct. 357, 94 L.Ed. 401 (1950) (privacy); Wilson v. United States, 221 U.S. 361, 382-86, 31 S.Ct. 538, 55 L.Ed. 771 (1911) (Fifth Amendment privilege against self-incrimination). The distinction between rights that may be asserted by corporations and those that may not is that "[c]ertain `purely personal' guarantees ... are unavailable to corporations and other organizations because the `historic function' of the particular guarantee has been limited to the protection of individuals." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 778-79 n. 14, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Whether a right is purely personal "depends on [its] nature, history, and purpose." Id.
 
 
 24
 The applicability of the Bill of Attainder Clause to corporations remains unsettled in every circuit. Without directly ruling on the question, the Supreme Court has stated, without discussion, that the Clause provides "protections for individual persons and private groups, those who are peculiarly vulnerable to nonjudicial determinations of guilt," South Carolina v. Katzenbach, 383 U.S. 301, 324, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (emphasis added). A corporation shares some of the characteristics of a "private group," but we need not decide whether corporations are included within the category of private groups because the reference to private groups plainly contemplates protection for some entities in addition to individual natural persons. The Court has also indicated in dictum that a bill of attainder may target a "single individual or firm." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 239 n. 9, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (emphasis added). No Court of Appeals has held as much, though several have expressly assumed without deciding that the Clause is applicable to corporations, finding the Clause inapplicable in the particular cases for other reasons. See Club Misty, Inc. v. Laski, 208 F.3d 615, 617 (7th Cir.2000); Navegar, Inc. v. United States, 192 F.3d 1050, 1065 (D.C.Cir.1999); SBC Communications, Inc. v. FCC, 154 F.3d 226, 234 & n. 11 (5th Cir.1998). For several reasons, we think the protection afforded by the Bill of Attainder Clauses is not a "`purely personal' guarantee[]" and therefore is one of the constitutional rights enjoyed by corporations.
 
 
 25
 First, the "historical function" of the Clause has been to ensure the procedural protections of the judicial process for the attribution of guilt and imposition of punishment. See Nixon, 433 U.S. at 468-69, 97 S.Ct. 2777; Brown, 381 U.S. at 442, 445, 85 S.Ct. 1707; Lovett, 328 U.S. at 316-17, 66 S.Ct. 1073; Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356 (1866). That guarantee is closely related to the right to procedural due process. See Coniston Corp. v. Village of Hoffman Estates, 844 F.2d 461, 468-69 (7th Cir.1988) (discussing the relationship between procedural due process rights and the prohibition on bills of attainder); see also Screws v. United States, 325 U.S. 91, 106, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (stating that "it is plain that basic to the concept of due process of law in a criminal case is a trial — a trial in a court of law".) The right to procedural due process has been applied to corporations. See, e.g., Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 413-19, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).[5]
 
 
 26
 Second, the cases in which the Court has refused to apply constitutional rights to corporations have uniformly involved competing state interests in regulating corporate conduct and investigating corporate wrongdoing, which depend on a high degree of transparency. Wilson v. United States, in which the Court held the Fifth Amendment privilege against self-incrimination inapplicable to corporations, rested its holding primarily on the "visitatorial power" that remains vested in the state after it grants a corporation its charter. See 221 U.S. at 382-84, 31 S.Ct. 538. Likewise, in United States v. Morton Salt Co., the Court justified its decision that corporations enjoy narrower rights to privacy by the state's interest in investigating corporate wrongdoing: "law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest." 338 U.S. at 652, 70 S.Ct. 357. Unlike visitatorial powers which do not directly affect the bottom line, punishment necessarily affects shareholder assets. Although New York unquestionably has an interest in investigating, regulating, and prosecuting the malfeasance of corporations within its borders, it has no interest in inflicting punishment for such malfeasance on the corporation's shareholders through the legislative process. Indeed, in the instant circumstances, a "law-enforcing agency," the PSC, has an existing administrative procedure to vindicate the interest in exploring utilities' wrongdoing: the prudence review process. That process addresses the state's interest in investigating and punishing utilities' misfeasance, and to the extent it does not do so adequately, the legislature may enact generally applicable legislation modifying that process.
 
 
 27
 Because punishment can frequently take the form of economic injury, a comparison with the Takings Clause of the Fifth Amendment is apt. The protection against targeted economic injury in the Takings Clause is fully applicable to corporations. See, e.g., United States v. 91.90 Acres of Land, 586 F.2d 79, 85-86 (8th Cir.1978). For both the Takings Clause and the Bill of Attainder Clauses, if the protections did not extend to corporations, their protections would be significantly undermined for individuals. When a corporation suffers an economic injury, its shareholders suffer the same economic injury. In order to protect shareholders from the economic injuries prohibited by the Takings Clause and the Bill of Attainder Clauses, corporations must be allowed to raise the clauses directly.
 
 
 28
 We have been unable to unearth any case in which a corporation has ultimately prevailed in challenging legislation as a bill of attainder — cases finding a bill of attainder targeting any party are extraordinarily rare. Nevertheless, bills of attainder historically have targeted corporations as well as natural persons. Con Ed cites several English statutes that imposed disabilities on English boroughs, hardly natural persons. See, e.g., 1 & 2 Geo. 4, c. 47 (Eng.1821). Moreover, one of the types of punishment most frequently imposed by bills of pains and penalties, punitive confiscation of private property, see Selective Serv. Sys. v. Minn. Pub. Interest Research Group, 468 U.S. 841, 852, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), is one that may injure a corporation in the same way it injures an individual. Cf. Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 284-85, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part) (arguing that Eighth Amendment Excessive Fines Clause applies to corporations, in part because a corporation, as an entity, may be subject to such penalties).
 
 
 29
 We therefore hold that corporations must be considered "individual[s]," Nixon, 433 U.S. at 468, 97 S.Ct. 2777, that may not be singled out for punishment under the Bill of Attainder Clause in Article I, Section 10.
 
 B. Retrospective Focus: Guilt
 
 30
 Another indispensible element of a bill of attainder is its retrospective focus: it defines past conduct as wrongdoing and then imposes punishment on that past conduct. See Nixon, 433 U.S. at 472-73, 97 S.Ct. 2777; Cummings, 71 U.S. (4 Wall.) at 325. Such a bill attributes guilt to the party or parties singled out in the legislation. See Nixon, 433 U.S. at 468, 97 S.Ct. 2777; De Veau v. Braisted, 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) ("The distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt."); Cummings, 71 U.S. (4 Wall.) at 323 (in enacting a bill of attainder "the legislative body ... assumes ... judicial magistracy; it pronounces upon the guilt of the party, without any of the forms or safeguards of trial").
 
 
 31
 Although on its face Chapter 190 does not speak in terms of guilt or innocence, we have no doubt that the legislature considered Con Ed guilty of wrongdoing in allowing the IP2 outage to occur. The primary evidence of this is the statute's focus on Con Ed's conduct related to a single, past incident, the IP2 outage, as the basis for the sanction it imposes. Chapter 190 makes explicit findings about the outage and concludes that "the Consolidated Edison Company failed to exercise reasonable care on behalf of the health, safety and economic interests of its customers." 2000 N.Y. Laws 190 § 1. The legislature's response is also limited to the IP2 incident, prohibiting Con Ed from "recovering from its ratepayers any costs associated with replacing the power from such facility." 2000 N.Y. Laws 190 § 2. The statute thus imposes liability "determined by no previous law or fixed rule." Lovett, 328 U.S. at 317, 66 S.Ct. 1073 (internal quotation marks omitted). Although an established procedure existed for determining whether Con Ed had been "imprudent" in incurring the costs associated with the outage, the legislature bypassed it and, in a single stroke, found guilt on the facts of Con Ed's case. The legislature, as the source of the PSC's authority, retains the power to reclaim authority over rate-setting from the PSC. However, the decision to bypass the PSC reinforces our conclusion that the legislature's decision was to find guilt and order punishment directly.
 
 
 32
 The retrospective focus of Chapter 190 is essential to our determination that the statute is a bill of attainder. The power of legislatures to enact purely prospective changes to utility rates, even to the rates of a single utility, is considerably broader than their authority to act retrospectively.
 
 C. Punishment
 
 33
 To invalidate legislation as a bill of attainder, the Bill of Attainder Clause "requires not merely `singling out' but also punishment." Plaut, 514 U.S. at 239 n. 9, 115 S.Ct. 1447; accord Nixon, 433 U.S. at 471-72 & n. 33, 97 S.Ct. 2777 (holding that "the Act's specificity — the fact that it refers to appellant by name — does not automatically offend the Bill of Attainder Clause"). A legislature may legitimately create a "class of one" for many purposes, see, e.g., Nixon, 433 U.S. at 472-73, 97 S.Ct. 2777, but not for punishment. We therefore must ascertain whether Chapter 190 punishes Con Ed.
 
 
 34
 Punishment of wrongdoing is, of course, a legitimate state interest reflected in the penal laws of the fifty states. Where a statute establishing a punishment declares and imposes that punishment on an identifiable party, however, the Bill of Attainder Clauses undermine the usual solicitude we have for such purposes. In such cases, we look beyond simply a rational relationship of the statute to a legitimate public purpose for "less burdensome alternatives by which [the] legislature ... could have achieved its legitimate nonpunitive objectives." Nixon, 433 U.S. at 482, 97 S.Ct. 2777.
 
 
 35
 Legislated punishment is not always easy to identify outside the traditional punishments of death or incarceration. Neither "the fact that harm is inflicted by governmental authority," Lovett, 328 U.S. at 324, 66 S.Ct. 1073 (Frankfurter, J., concurring), nor "the severity of [the] sanction is ... determinative of its character as `punishment,'" Flemming v. Nestor, 363 U.S. 603, 616 n. 9, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Indeed, as traditionally conceived, punishment implicates a variety of values that, in other contexts, bear no necessary relation to punishment. For example, a judicial order of compensation in a negligence action imposes "harm" on the defendant — he must pay the damage award — but that harm is merely compensatory for the plaintiff's injury, not punitive. Compensation may be part of a punishment, on the other hand, as where a criminal defendant is ordered to make restitution to his victim. Similarly, deterrence may be a legitimate, nonpunitive goal, such as deterrence of unreasonable conduct produced by a damages award for negligence — but it is also a core component of punishment. See, e.g., Brown, 381 U.S. at 458, 85 S.Ct. 1707. Retribution may be one value that is limited to the arena of punishment, but it is not a necessary part of "punishment." See Selective Serv. Sys., 468 U.S. at 851-52, 104 S.Ct. 3348; Brown, 381 U.S. at 458, 85 S.Ct. 1707 ("It would be archaic to limit the definition of `punishment' to `retribution.'").
 
 
 36
 The Supreme Court articulated three factors to guide a court's determination of whether a statute directed at a named or readily identifiable party is punitive: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, `viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record `evinces a [legislative] intent to punish.'" Selective Serv. Sys., 468 U.S. at 852, 104 S.Ct. 3348 (quoting Nixon, 433 U.S. at 473, 475-76, 478, 97 S.Ct. 2777). Nixon makes it clear that a statute need not fit all three factors to be considered a bill of attainder; rather, those factors are the evidence that is weighed together in resolving a bill of attainder claim. Nixon, 433 U.S. at 473-78, 97 S.Ct. 2777. The party challenging the statute has the burden of "establish[ing] that the legislature's action constituted punishment and not merely the legitimate regulation of conduct." Id. at 476 n. 40, 97 S.Ct. 2777. Unfortunately, because the Supreme Court's bill of attainder jurisprudence is limited, it provides us with little guidance for determining whether a statute is impermissibly punitive.
 
 1. Traditional Punishments
 
 37
 We look first to the "infamous history of bills of attainder" to determine whether Chapter 190 imposes the sorts of "deprivations and disabilities so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription of [the Clause]." Id. at 473, 97 S.Ct. 2777. Some types of legislatively imposed harm, in other words, are considered to be punitive per se. The classic example is death, but others include "imprisonment, banishment, ... the punitive confiscation of property[, and prohibition of] designated individuals or groups from participation in specified employments or vocations." Id. at 473-74, 97 S.Ct. 2777; accord Selective Serv. Sys., 468 U.S. at 852, 104 S.Ct. 3348.
 
 
 38
 The only traditional punishment implicated here is punitive confiscation of property. On the one hand, Chapter 190 clearly deprived Con Ed of a property interest by prohibiting the ordinarily permitted pass-through of costs. All told, Chapter 190 deprives Con Ed of approximately $250 million that it would otherwise have been able to obtain from its customers. On the other, we are not certain that a "deprivation" is the same thing as a "confiscation," and indeed, the Supreme Court has held that an adverse utility-rate decision is not "confiscatory" for the purposes of the Takings Clause unless it produces an overall unfair rate of return for the utility. See Duquesne Light Co. v. Barasch, 488 U.S. 299, 307, 310, 313-14, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989).
 
 
 39
 A statute need not fit within the historical category of punishment to be considered such. Such a rule would render the Clauses unable to respond to attempts by contemporary legislatures to punish individuals in new and heretofore unforeseen ways. See Nixon, 433 U.S. at 475, 97 S.Ct. 2777. We need not resolve this close question to conclude that Chapter 190 is nonetheless a bill of attainder. Accordingly, we do not decide whether Chapter 190 imposes a traditional attainder and turn instead to the next component of the test.
 
 
 40
 2. The "Functional" Test: Nonpunitive Statutory Goals
 
 
 41
 The second component of the Supreme Court's test is "functional," looking to
 
 
 42
 whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes.... Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers.
 
 
 43
 Id.; see also Flemming, 363 U.S. at 615, 80 S.Ct. 1367 (describing "inability to discern any alternative [nonpunitive] purpose which the statute could be thought to serve" as a basis for finding a statute to be punitive) (citing Trop v. Dulles, 356 U.S. 86, 97, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)); Brown, 381 U.S. at 476, 85 S.Ct. 1707 (White, J., dissenting) ("The imposition of a particularly harsh deprivation without any discernible legitimate legislative purpose has ... been characterized as penal."). In doing so, we "inquire into the existence of less burdensome alternatives by which [the] legislature... could have achieved its legitimate nonpunitive objectives." Nixon, 433 U.S. at 482, 97 S.Ct. 2777. Try as we may, we can discern no wholly non-punitive purpose to justify the entire cost-pass-through prohibition in Chapter 190.
 
 
 44
 To be sure, part of the statute's cost-pass-through prohibition has an arguably non-punitive purpose. By preventing Con Ed from passing through the costs associated with the IP2 outage that it would not have incurred ordinarily, the legislature prevented Con Ed's ratepayers from being forced to bear costs that the legislature viewed as negligently incurred. Con Ed would be forced to compensate its ratepayers for costs passed through prior to Chapter 190's enactment and could not force ratepayers to bear any further pass-throughs due to the IP2 outage. This is not necessarily a punitive purpose. The legislature could legitimately conclude that, as between Con Ed, the party that caused the outage, and the ratepayers, parties having nothing whatsoever to do with the outage, Con Ed should bear the costs attributable to its negligence. The legislature could decide that it would be unfair to force ratepayers to absorb the costs of Con Ed's error. If such a conclusion were reached by a court in a negligence action, for instance, no one would reasonably conclude that the court had "punished" Con Ed.[6] This is a distributional fairness rationale that has nothing inherently to do with punishment.
 
 
 45
 Nevertheless, eliminating harm to innocent third parties is a purpose consistent with punishment. See Brown, 381 U.S. at 458, 85 S.Ct. 1707 (noting that "[a] number of English bills of attainder were enacted for preventive purposes"). However, because there is a clear non-punitive component to cost-allocation, we think that, if that were all that Chapter 190 did, it would be insufficient to justify a conclusion that the statute punishes Con Ed.
 
 
 46
 Chapter 190 also functions to deter similar conduct by Con Ed and other public utilities in the future. By forcing Con Ed to absorb the costs of the outage, the statute encourages Con Ed and other utilities to be more diligent thereafter in avoiding similar outages. In this respect, Chapter 190 serves an economic-regulatory function. As a regulated monopoly, Con Ed does not face the same incentives to minimize costs as does an actor in a competitive market. Indeed, that fact is the basic justification of regulation of such monopolies: the state may act to encourage the monopoly to minimize costs as if it were faced with competition. See Paul A. Samuelson & William D. Nordhaus, Economics 520-21 (12th ed.1985). Chapter 190 can be viewed, in part, as accomplishing that regulatory function, enhancing economic efficiency rather than punishing Con Ed for wrongdoing. State regulation of utilities to promote economic efficiency is a longstanding and unquestionably legitimate goal of state legislation. See New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 365, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ("`[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.'") (quoting Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n, 461 U.S. 375, 377, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983)) (alteration in original).
 
 
 47
 Chapter 190 might also deter negligent conduct with an eye toward protecting public health; the legislative findings in Chapter 190 focus to a considerable extent on the "potential threats to public health and safety" from nuclear power plant accidents. 2000 N.Y. Laws 190 § 1. All other things being equal, this would be an ample justification for the deterrent function of Chapter 190. However, the field of public health and safety regulation of nuclear power generation has been occupied by Congress through the Atomic Energy Act, 42 U.S.C. §§ 2011 et seq., and therefore any regulation in that area by the states is preempted. See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 206-07, 212, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); Suffolk County v. Long Island Lighting Co., 728 F.2d 52, 59-60 (2d Cir.1984). Consequently, we cannot consider public health and safety as a valid, non-punitive justification for Chapter 190.
 
 
 48
 General and specific deterrence are also traditional justifications for punishment, however. See Selective Serv. Sys., 468 U.S. at 851-52, 104 S.Ct. 3348 ("Punishment is not limited solely to retribution for past events, but may involve deprivations inflicted to deter future misconduct."); 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law, § 1.5(a)(1), (4) (1986). If the entirety of the cost-pass-through prohibition served the economic-regulatory function described above, we might be willing to conclude that Chapter 190's deterrent function was non-punitive. Our view of the "type and severity of burdens imposed," Nixon, 433 U.S. at 475, 97 S.Ct. 2777, by Chapter 190, however, leads us to a different conclusion.
 
 
 49
 Our reading of the record and statements made by counsel at oral argument indicate that some indefinite but quite substantial proportion of the costs that Con Ed has sought to pass through to its ratepayers that are denied by Chapter 190 could have been passed through unchallenged if Con Ed had installed the new generators in the ordinary course of business at any time after they received them in 1985. To install new generators, Con Ed must take IP2 offline for an extended period of time. During this period, Con Ed must purchase power on the open market to cover the lost generating capacity at IP2. Further, Con Ed would have to pay the cost of labor and parts necessary to remove the old generators and install the new ones. These costs would be incurred whenever the generators are replaced, whether during scheduled maintenance prior to the generators' failure or, as here, after that failure had occurred. Such costs are ordinary to the business and thus may be ordinarily passed through.
 
 
 50
 Of course, there would be some differences in the costs incurred during a scheduled outage and those incurred during an accidental outage. The failure might cause damage to other facility components, which would need to be repaired or replaced. There may be some differences in the cost of labor between a scheduled and unscheduled replacement: for instance, Con Ed might be required to pay more overtime to workers in the event of an unplanned outage. The cost of power would also likely differ between the time at which a scheduled outage could have occurred and the time at which the accidental outage occurred. Indeed, if Con Ed had replaced the generators during a planned outage, it presumably would have intentionally timed the outage to coincide with a period of reduced energy prices. The bulk of the labor and power-replacement costs under either scenario, however, appear to be the same.[7]
 
 
 51
 It is undisputed that Con Ed would have been allowed to pass through to ratepayers the costs of covering power demand while replacing the generators during a scheduled outage. What, then, we must ask, other than punishment can justify forcing Con Ed to absorb those same costs after the accidental outage? Neither of the legitimate purposes set out above — prevention of harm to ratepayers and deterrence of inefficient, monopolistic conduct—can justify preventing Con Ed from passing these costs along to ratepayers. It does not protect ratepayers from, or compensate them for, new unjustified costs, because those costs would have been incurred even if Con Ed had acted as a prudent, model corporate citizen. Nor does it deter Con Ed or other utilities from incurring excess costs in the future: if Con Ed were faced with precisely the same situation in the future, it might be discouraged from delaying the installation of replacement generators, but in acting more quickly it would incur substantially the same costs that it now is being precluded from passing through to its ratepayers. There is no connection between these costs and the sort of lax monopolistic conduct that utility regulation would ordinarily seek to deter.
 
 
 52
 Moreover, there are plainly "less burdensome alternatives by which [the] legislature... could have achieved its legitimate nonpunitive objectives." Nixon, 433 U.S. at 482, 97 S.Ct. 2777. The legislature easily could have tailored Chapter 190 to exclude from the pass-through prohibition those substantial costs that would have been incurred absent misconduct on Con Ed's part. For instance, it could have limited the pass-through prohibition to the incremental cost of energy beyond that prevailing when the replacement generators were purchased and any costs associated with the unplanned nature of the accidental outage such as overtime pay and damage to other facility components. Although we do not mean to hold that these costs need to have been identified with surgical precision, the legislature in this case made no attempt whatsoever to ensure that the costs imposed on Con Ed were proportional to the problems that the legislature could legitimately seek to ameliorate. Rather, by lumping all costs of the outage together and forcing Con Ed to absorb them, the legislature piled on a burden that was obviously disproportionate to the harm caused.
 
 
 53
 Whether a government action is punishment varies depending on context. There may well be actions that would be considered punitive if taken against an individual, but not if taken against a corporation. Similarly, the government may have more flexibility to take actions that affect public utilities than it does when dealing with corporations in competitive markets. We need not explore this issue further to resolve this case, however, because Chapter 190 demonstrates a punitive intent even though it applies to a public utility corporation.
 
 3. Indicia of Punitive Legislative Intent
 
 54
 Finally, we look to see whether the legislative history evinces a legislative intent to punish. See Selective Serv. Sys., 468 U.S. at 852, 104 S.Ct. 3348 (citing Nixon, 433 U.S. at 478, 97 S.Ct. 2777); Brown, 381 U.S. at 476, 85 S.Ct. 1707 (White, J., dissenting). The legislative record by itself is insufficient evidence for classifying a statute as a bill of attainder unless the record reflects overwhelmingly a clear legislative intent to punish. See Flemming, 363 U.S. at 617, 80 S.Ct. 1367 ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground [of legislative history.]"); see also, e.g., Lovett, 328 U.S. at 308-12, 66 S.Ct. 1073 (recounting extensive evidence of punitive intent in the legislative record). Statements by a smattering of legislators "do not constitute [the required] unmistakable evidence of punitive intent." Selective Serv. Sys., 468 U.S. at 856 n. 15, 104 S.Ct. 3348 (internal quotations omitted). Although the evidence of punitive intent in the legislative record in this case is insufficient on its own to justify a conclusion that Chapter 190 is punitive, the legislative history does contain some explicit evidence of punitive intent. That legislative history bolsters our prior conclusion that a significant portion of Chapter 190's cost-pass-through prohibition is plainly punitive.
 
 
 55
 Our reading of the legislative history indicates that certain legislators unquestionably intended to punish Con Ed: there are clear references by two senators to punishment and penalties. A sponsor of the legislation, Senator Velella, stated: "Con Edison has done a terrible thing here.... And Velella's law is going to stop them and punish them." A. 10096, N.Y. Senate Debate Transcript, at 3906-07 (2000) (statement of Sen. Velella); see also A. 10096, N.Y. Senate Debate Transcript, at 3912 (2000) (statement of Sen. Oppenheimer) (arguing that Con Ed "should certainly be penalized").
 
 
 56
 The statements of a few legislators are plainly not overwhelming evidence of penal intent, and if that were the only evidence that the statute is punitive, we would have no trouble holding that the statute is not a bill of attainder. But the stated intent of at least some legislators—most notably one of the floor managers of the legislation — to punish Con Ed reinforces our independent conclusion that a substantial part of the legislation cannot be justified by any legislative purpose but punishment.
 
 D. Severability
 
 57
 Chapter 190 is not susceptible to severance of constitutional provisions from unconstitutional provisions because it contains only a single unitary provision. We are disinclined to rewrite the legislation to fashion a rule that the legislature never intended by attempting to identify and sever those costs Con Ed may constitutionally be prevented from passing through from the rest. In addition, because the punitive intent of some portions of Chapter 190 is clear, we conclude that all of Chapter 190 is a bill of attainder, absent clear evidence that some severable section was passed without punitive intent. Because no such evidence exists and the statute is a unitary provision that resists severability analysis, we invalidate Chapter 190 in its entirety.
 
 
 58
 In finding Chapter 190 to be a bill of attainder, we are mindful of the infrequency with which this constitutional provision has been used to strike down legislation. That rarity is attributable to the extraordinary scarcity of legislation of the type presented in Chapter 190. When faced with a bill that is so exceptionally narrow in scope, manifestly retrospective in focus, and unavoidably punitive in operation, we cannot allow it to stand, notwithstanding the heavy presumption of legitimacy that is ordinarily accorded legislative decisions. In such circumstances we are reminded of Alexander Hamilton's reflection on the function of judicial review in Federalist 78:
 
 
 59
 [A] limited constitution [is] one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no ex post facto laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.
 
 
 60
 The Federalist No. 78, at 466 (Hamilton) (Clinton Rossiter, ed., 1961) (italics removed).
 
 II. Scrivener's Error in the Judgment
 
 61
 Although we affirm, we must remand to the district court with direction to correct the obvious scrivener's error on its judgment form, indicating that "the case is DISMISSED in its ENTIRETY, in favor of the Plaintiff and against the Defendants; and it is FURTHER ORDERED, that the plaintiff's motion for a permanent injunction is GRANTED." Cf. United States v. Latorre-Benavides, 241 F.3d 262, 264 (2d Cir.) (per curiam) (affirming but remanding to correct typographical error in judgment), cert. denied, 532 U.S. 1045, 121 S.Ct. 2013, 149 L.Ed.2d 1014 (2001).
 
 CONCLUSION
 
 62
 For the foregoing reasons, the judgment of the district court is hereby affirmed. The case is remanded to the district court to conform the judgment to the substance of the district court's disposition. The district court shall strike the words "the case is DISMISSED in its ENTIRETY, in favor of the Plaintiff..." and replace them with "JUDGMENT is GRANTED, in favor of the Plaintiff..." Costs are awarded to the Plaintiff-Appellee.
 
 
 
 Notes:
 
 
 *
 The Honorable David G. Larimer of the United States District Court for the Western District of New York, sitting by designation
 
 
 [1]
 The judgment incorrectly, and incomprehensibly, stated that "the case is DISMISSED in its ENTIRETY, in favor of the Plaintiff." We accordingly remand for correction of this obvious scrivener's errorSee infra, Part II.
 
 
 [2]
 We thus do not decide whether Chapter 190 violates the Equal Protection Clause, which supplied one basis for the district court's injunction. We are skeptical, however, that the Clause would require invalidation of Chapter 190: "[M]ere underinclusiveness is not fatal to the validity of a law under ... equal protection[,] even if the law disadvantages an individual or identifiable members of a group."Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 471 n. 33, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (internal citations omitted). To be so invalidated, the classification must have "no rational basis," Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), and we doubt that the present statute meets that standard.
 
 
 [3]
 In English practice, bills of attainder imposed the death penalty. Other, less severe punishments were imposed by "bills of pains and penalties." The Supreme Court has held that the constitutional prohibition reaches bothSee United States v. Brown, 381 U.S. 437, 447, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 138, 3 L.Ed. 162 (1810) (Marshall, C.J.) ("A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both.").
 
 
 [4]
 Our analysis is unaffected by separation of powers principles, on which the district court relied heavily, 117 F.Supp.2d at 268, citingBrown, 381 U.S. at 441, 443-45. Brown was decided under the Clause applicable to Congress in Article I, § 9, not that in § 10, which applies to the states. Brown's statements about separation of powers doctrine are inapplicable to the § 10 Bill of Attainder Clause for the simple reason that the federal Constitution does not impose any particular separation of powers requirement on state governments: "How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself." Highland Farms Dairy, Inc. v. Agnew, 300 U.S. 608, 612, 57 S.Ct. 549, 81 L.Ed. 835 (1937); see also Mayor of Phila. v. Educ. Equal. League, 415 U.S. 605, 615 n. 13, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) ("The Constitution does not impose on the States any particular plan for the distribution of governmental powers.") (citing Sweezy v. New Hampshire, 354 U.S. 234, 256, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)); Dreyer v. Illinois, 187 U.S. 71, 84, 23 S.Ct. 28, 47 L.Ed. 79 (1902) ("Whether the legislative, executive and judicial powers of a state shall be kept altogether distinct and separate... is for the determination of the state."). Indeed, where § 10 is involved, our concern for the independent operation of each of the branches of government must be tempered by our concern about preserving to the states the choice of government structures. See 1 Laurence H. Tribe, American Constitutional Law § 2-4, at 132-33 (3d ed.2000).
 
 
 [5]
 Although less closely analogous, the Sixth Amendment right to trial by jury in criminal cases has also been applied to corporations in this CircuitSee United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 663 (2d Cir.1989).
 
 
 [6]
 Indeed, in tort, a punitive damages award would be inappropriate for a finding of mere negligenceSee W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 2, at 9-10 (5th ed.1984).
 
 
 [7]
 Although the district court found this to be the case, it did not make findings about the exact amount of these costs. 117 F.Supp.2d at 270